Affirmed by published opinion. Judge WILKINSON wrote the majority opinion, in which Judge FLOYD joined. Judge DIAZ wrote a dissenting opinion.
OPINION
WILKINSON, Circuit Judge:
Irvin Bumpers was convicted of being a felon in possession of a firearm in violation of 18 U.S.C. § 922(g)(1). He now appeals the district court’s denial of his motion to suppress the firearm that was the basis of his conviction. For the reasons that follow, we affirm the judgment.
I.
On the evening of December 18, 2009, Newport News Police Officer R.B. Tinsley was on routine patrol in his police car. Around 7:30 p.m., his route took him to the *170 intersection of 27th Street and Chestnut Avenue, the location of a small shopping plaza occupied mainly by a local convenience store.
In Officer Tinsley’s experience, the shopping plaza was a “high-drug” and “high-crime area” where “multiple shootings” and “countless drug arrests” had taken place. Officer Tinsley considered it to be one of the worst crime spots in the City of Newport News—an assessment that specifically included the convenience store’s parking lot. The convenience store had a particular history of problems with trespassing, leading the store’s owner to post “no trespassing” signs around the store and to file a written request for the police to “enforce criminal violations” on the premises. Officer Tinsley was aware of this written request on the evening in question.
As he approached the shopping plaza, Officer Tinsley noticed two men standing next to a pair of garbage dumpsters “toward the back” of the convenience store’s side parking lot, off to the north side of the building. The place where the men were standing was “not even close” to the convenience store’s front entranceway, which was located on the west side of the building. There was no indication that the men had shopping bags or any other items suggestive of recent purchases from the store.
Officer Tinsley observed the two men standing by the garbage dumpsters for five to ten seconds as he approached the parking lot. Once he pulled his car into the lot, the men saw him “almost immediately” and began to walk away at a “fast pace,” trying to “get away from the area.” Although their path took them past the convenience store’s entrance, neither man made an attempt to enter the store. Instead, their reaction matched a pattern of previous trespassing conduct in the same parking lot of which Officer Tinsley was well aware: individuals would stand “around that corner behind the dumpster” and then “immediately start to walk away” upon seeing a police officer.
Suspecting that the two men had been trespassing, Officer Tinsley exited his vehicle and told them that they were not free to go and that he needed to see their identification. One of the men disregarded Officer Tinsley’s order, but the other man stopped: the defendant, Irvin Bumpers.
Bumpers informed Officer Tinsley that his name was “Aaron Bumpers.” The officer ran a records check on that name, which returned an active warrant. Officer Tinsley accordingly placed Bumpers under arrest. Bumpers then informed Officer Tinsley that he had not provided his real name and that he was actually “Irvin Bumpers.” The officer ran a records check on this second name, which also returned an active warrant. Officer Tins-ley told Bumpers that he was therefore still under arrest and proceeded to search him incident to that arrest. The search uncovered a fully-loaded, .38 caliber Special Taurus revolver in the pocket of Bumpers’s hooded sweatshirt.
A federal grand jury indicted Bumpers for being a felon in possession of a firearm and ammunition in violation of 18 U.S.C. § 922(g)(1). Bumpers filed a pre-trial motion to suppress, arguing that the revolver and ammunition were gathered as the result of an unlawful seizure. The district court held a suppression hearing during which it heard testimony from Officer Tinsley regarding the circumstances surrounding his investigatory stop of Bumpers. The court then denied the motion, ruling that the stop was supported by a reasonable suspicion that Bumpers was trespassing based on the “high crime area” where he was found, the fact that he was standing “near a dumpster on the side of *171 the convenience store” in a location away from the entrance, his evasive reaction in “walking] away from the officer at a quick pace,” and the route that he took upon leaving the premises.
Bumpers proceeded to a bench trial where he stipulated to the elements of the felon-in-possession charge. The court found Bumpers guilty and sentenced him to forty-two months in prison. Bumpers now appeals the denial of his motion to suppress.
II.
The touchstone of the Fourth Amendment inquiry is one of simple reasonableness. Pennsylvania v. Mimms, 434 U.S. 106, 108-09, 98 S.Ct. 330, 54 L.Ed.2d 331 (1977) (per curiam). The term itself suggests a balance. In this case, that balance lies “between the public interest” in basic community safety and “the individual’s right to personal security free from arbitrary interference by law officers.” United States v. Brignoni-Ponce, 422 U.S. 873, 878, 95 S.Ct. 2574, 45 L.Ed.2d 607 (1975). Where to strike the balance between these two important interests is the product of intensive factual inquiry, but there can be no doubt that the weighing of these respective values informs the resolution of many a Fourth Amendment case.
On one side of the scale is the Fourth Amendment’s role in preserving individual dignity and liberty by shielding citizens from arbitrary and purposeless police restraints. Thus, for example, the Supreme Court decisively rejected the argument raised in Terry v. Ohio that “the Fourth Amendment does not come into play at all” when a police officer detains someone in a brief investigatory stop instead of a full-blown arrest. 392 U.S. 1, 19, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). The Court instead announced the now-familiar standard that even a brief investigatory stop is impermissible unless the officer’s action is supported by a reasonable and articulable suspicion, under all the circumstances, that criminal activity “may be afoot.” Id. at 21, 30, 88 S.Ct. 1868; see also, e.g., United States v. Arvizu, 534 U.S. 266, 273, 122 S.Ct. 744, 151 L.Ed.2d 740 (2002).
Central to the analysis in Terry was the Supreme Court’s recognition that even a brief police investigatory stop constitutes a “restraint” of an individual’s “freedom to walk away,” and that such a stop can involve a “serious intrusion upon the sanctity of the person, which may inflict great indignity and arouse strong resentment.” 392 U.S. at 16, 17, 88 S.Ct. 1868. That concern is surely present with respect to persons who live in the vicinity of a neighborhood convenience store like the one where Bumpers was found. Simply put, a person has every right to go about his daily business unobstructed—to do what he wants when he wants, so long as his actions violate no law. If such a person is approached by an officer who lacks reasonable suspicion that the person “has committed or is about to commit a crime,” the Fourth Amendment enables the person to refuse to “answer any question put to him; indeed, he may decline to listen to the questions at all and may go on his way.” Florida v. Royer, 460 U.S. 491, 498, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983) (plurality opinion).
Animated by this interest in individual dignity and liberty, the Fourth Amendment operates as a bar against unfounded police stops. As the Court wrote in Terry, the Fourth Amendment is not satisfied by a mere “inchoate and unpartic-ularized suspicion or ‘hunch’ ” of criminal activity. 392 U.S. at 27, 88 S.Ct. 1868. The Supreme Court has accordingly held that when considered alone, an individual’s *172 mere “presence in an area of expected criminal activity ... is not enough to support a reasonable, particularized suspicion that the person is committing a crime.” Illinois v. Wardlow, 528 U.S. 119, 124, 120 S.Ct. 673, 145 L.Ed.2d 570 (2000). The individual’s interest in being free from unjustified police intrusions thus does not disappear because he may be found in an area that is susceptible to crime; the interest follows the individual wherever he or she may go.
But just as the individual liberty interest is critical to the Fourth Amendment’s reasonableness requirement, so too is there a weighty interest on the other side of the balance: the community’s interest in basic public safety. See Terry, 392 U.S. at 15, 88 S.Ct. 1868 (observing that the Fourth Amendment should not be applied in a “rigid and unthinking” way that would “exact a high toll in human injury and frustration of efforts to prevent crime”). That is to say, the proprietor and customers of the convenience store in this case share an important stake in the safety of the area.
The proprietor has a vital interest in ensuring that his store is a safe place for himself, his employees, and his customers because, quite simply, his business, and the well-being of those who work and shop there, depend on it. It is an all too regrettable fact that many small businesses are unwilling to locate within'—or are driven out of—neighborhoods that are beset by crime. See Christopher H. Wheeler, Neighborhood Characteristics Matter When Businesses Look for a Location 15-16 (2006). Indeed, the record in this case shows that the business immediately next to the convenience store where Bumpers was found was shuttered right around the time of Bumpers’s arrest.
It is also unremarkable to observe that a neighborhood convenience store can serve as a natural gathering place for drug dealers. The proprietor here thus took sensible steps to ensure the safety of his business in response to the high incidence of crime in the area and the pattern of prior trespassing on his own property: he posted “no trespassing” signs around the premises and filed a request asking the police to enforce violations. The circumstances that drive local merchants in dangerous areas to take such measures are necessarily severe, since a retailer would ordinarily not want to post “no trespassing” signs for fear of chasing off business. A retailer would only post such signs, in other words, when the dangers of trespassers lurking around the store pose a significantly greater threat than the risk of chasing customers away.
The store’s patrons likewise have an interest in the safety of the area. Convenience stores often serve as a hub for local neighborhoods, a place where many residents—some who may be elderly and others who may be minors—need to shop in order to pick up some aspirin or a decongestant, purchase a quart of milk, or buy a can of soup or box of cereal. Some customers who patronize stores in disadvantaged neighborhoods may lack access to an automobile. The local convenience store thus takes on heightened importance because of its accessibility—a fact that in turn heightens the need to ensure the security of the area. Here it is undisputed that multiple shootings had taken place at this very site. In such circumstances, the local resident’s journey to market must not be one of fear or apprehension that residents of more affluent communities never have to face.
The dissent protests that by referencing the convenience store’s undisputed features—its trespassing signs, shuttered neighbors, multiple shootings and “violent history”—we appear to give “dispositive weight” to the high-crime nature of the *173 area in which the stop occurred, post at 179-80. Not so. The undisputed fact that this particular convenience store was the site of multiple shootings and drug crimes is but one consideration (and not the most important one) in our analysis, in addition to Bumpers’s suspicious location, evasive reaction, and path of escape. Further, there is no support for the proposition that we are to ignore the circumstances surrounding the stop—circumstances that are not generalizations about high-crime areas, but are rather concrete and specific to the very store in question—and somehow apply the Fourth Amendment in a vacuum. Officers, of course, do not investigate in vacuums, they investigate in settings. To blind our eyes to such settings would simply make adjudication ill-informed.
Moreover, to hobble the ability of law enforcement officers to investigate even objectively suspicious activity raises the risk of throwing Fourth Amendment reasonableness out of balance. Recognizing the substantial public interest in community safety, the Supreme Court has made clear that in the context of brief investigatory police stops, the “balance between the public interest and the individual’s right to personal security tilts in favor of’ a reasonable suspicion requirement, which is of course “a standard less than probable cause.” Arvizu, 534 U.S. at 273, 122 S.Ct. 744 (internal quotation marks and citation omitted).
It is important ultimately that neither of these two competing interests crowd the other out. With that in mind, we turn to Bumpers’s contentions in this case.
III.
A.
The most precise instrument that the judiciary possesses for ensuring the proper balance between the interests that under-gird the Fourth Amendment is the on-the-ground assessment of district courts. It is the trial judge who renders a particularized ruling as to the reasonableness of a Terry stop based on the credibility of live testimony given by those involved and, frequently, first-hand knowledge of the area where the stop occurred. The dissent asserts, however, that we have given deference to the district court’s “ultimate legal conclusion,” post at 183. To the contrary, we have respected only the fact that one who has heard testimony has an advantage in appraising and describing the sequence of events that form the basis of a claim. See Ornelas v. United States, 517 U.S. 690, 700, 116 S.Ct. 1657, 134 L.Ed.2d 911 (1996).
The distinctive competence of district court judges here is no mere abstraction. It flows from the Supreme Court’s concrete admonition to appellate courts to “give due weight to inferences drawn from [findings of] fact[ ] by resident judges.” Id. at 699, 116 S.Ct. 1657; see also Arvizu, 534 U.S. at 273-74, 277, 122 S.Ct. 744. In noting the obvious point that the question before us is a mixed question of law and fact subject ultimately to de novo review, Ornelas, 517 U.S. at 691, 696, 116 S.Ct. 1657, the dissent appears to give little if any weight to the function that a district court performs. It simply wishes away Ornelas’s express recognition of that role as “dicta,” post at 183. But dispensing with Supreme Court analysis in this fashion is risky business. Thus, although the ultimate question of whether reasonable suspicion existed is of course a “mixed question of law and fact,” that standard does not displace the reality that district judges find underlying facts and draw inferences that warrant deference. Ornelas, 517 U.S. at 697, 699, 116 S.Ct. 1657. In the words of the Supreme Court:
*174 A trial judge views the facts of a particular case in light of the distinctive features and events of the community.... The background facts provide a context for the historical facts, and when seen together yield inferences that deserve deference. For example, what may not amount to reasonable suspicion at a motel located alongside a transcontinental highway at the height of the summer tourist season may rise to that level in December in Milwaukee.... The background facts, though rarely the subject of explicit findings, inform the judge’s assessment of the historical facts.
Id. at 699, 116 S.Ct. 1657. The familiar fact-finding advantages enjoyed by district courts dovetail with a second reason for respecting their judgments in this context. By upholding a district court’s Terry ruling when it is objectively reasonable in light of the record, appellate courts can best achieve in the aggregate the very equipoise between individual liberty and public safety that the Fourth Amendment commands. Slight factual variations may suggest different results, and respecting the particularized character of the fact-finding process leaves room for different rulings when the credibility of the officer and/or the setting of the stop are significantly or even slightly not the same. A reversal in the face of a trial court’s assessment of live testimony necessarily carries a heavier hand. There is less room for the flexibility of fact-finding in future cases and hence a heightened risk that either personal liberty or public safety will be unreasonably shortchanged.
It makes sense then in close cases such as this one to accord some respect to the fact-finder’s advantaged posture and to proceed narrowly and non-preclusively in rulings of our own. District judges should continue to scrutinize the situations that come before them, mindful of our view that variable facts may lead to variable results—none of which are necessarily unreasonable so long as the Fourth Amendment balance is assiduously and conscientiously maintained.
B.
The police conduct challenged in this case is Officer Tinsley’s decision to stop Bumpers for the purpose of investigating whether he was trespassing. It is a stop at issue—not a frisk and not an arrest—either of which would have required more than Officer Tinsley had here. “Consideration of the extent of the intrusion abounds in modern Fourth Amendment doctrine.” United States v. Chaidez, 919 F.2d 1193, 1197 (7th Cir.1990). Indeed, it was only upon discovering an active warrant during the Terry stop, and searching Bumpers incident to his undisputedly lawful arrest on that warrant, that Bumpers’s firearm was discovered.
Nor does Bumpers contend that Officer Tinsley stopped him based on a suspicion that he was a felon in possession of a firearm, the crime for which he was ultimately convicted. The facts are clear that the suspicion that gave rise to the challenged investigatory stop was instead Officer Tinsley’s belief that Bumpers was engaged in the particular crime of trespassing. Nothing in the Fourth Amendment renders modest measures in the enforcement of modest infractions impermissible. See Atwater v. City of Lago Vista, 532 U.S. 318, 121 S.Ct. 1536, 149 L.Ed.2d 549 (2001).
With that in mind, several factors prevent us from concluding that the district court erred reversibly in its judgment that Officer Tinsley possessed a reasonable suspicion that Bumpers was trespassing at the time of the Terry stop. In reaching this decision, we are cognizant of the Supreme Court’s observation that factors *175 that may be “susceptible of innocent explanation” when taken in isolation can combine to “form a particularized and objective basis” for a stop when considered together. Arvizu, 534 U.S. at 277-78, 122 S.Ct. 744; see also United States v. Glover, 662 F.3d 694, 698 (4th Cir.2011). And because the district court denied Bumpers’s motion to suppress, “we construe the evidence in the light most favorable to the Government” on appeal. United States v. Hernandez-Mendez, 626 F.3d 203, 206 (4th Cir.2010).
First, although the high-crime nature of the area in which a stop is performed is plainly not alone enough to support a reasonable suspicion of criminal activity, it is one of “the relevant contextual considerations” that a court may credit in a Terry analysis. Wardlow, 528 U.S. at 124, 120 S.Ct. 673. In this case, Officer Tinsley testified during the suppression hearing that the convenience store where he observed Bumpers and his companion was part of a shopping plaza where “multiple shootings” and “countless drug arrests” had taken place. Indeed, the very place where Bumpers was standing was an area where trespassers were commonly found. Officer Tinsley was keenly aware of the area’s criminal history on the evening in question, in no small part because the store owner had filed a formal request with the police to “enforce criminal violations” on the premises.
Second, the particular location and manner in which Bumpers and the other man were standing suggested that they may have been engaged in the specific, ongoing crime of trespassing. Officer Tinsley testified that as he pulled his patrol car into the convenience store parking lot, he observed Bumpers and the second man standing next to a pair of garbage dumpsters—off to the north side of the store in a location “not even close” to the store’s west side entrance—-for five to ten seconds. The area where the men were standing was posted “no trespassing,” and Officer Tinsley could legitimately note that a dumpster in a completely different place from the store’s entrance was not a natural spot for customers to be just standing around. Moreover, no evidence was presented during the suppression hearing suggesting that Bumpers or the other man were carrying shopping bags or any other items that would have indicated that they had been lawful patrons of the store.
Third, Bumpers’s “evasive behavior” upon seeing Officer Tinsley’s patrol car was another “pertinent factor” that contributed to the reasonable suspicion determination. Wardlow, 528 U.S. at 124, 120 S.Ct. 673. In Wardlow, the Supreme Court held that a defendant’s flight upon seeing a police car in a high-crime area was enough to create a reasonable suspicion of criminal activity sufficient to justify a Terry stop. 528 U.S. at 124-25, 120 S.Ct. 673. Here, as in Wardlow, Bumpers acted to evade the police upon noticing a patrol car in a high-crime area. As Officer Tinsley testified, “[a]s soon as they noticed” the patrol car, Bumpers and the other man reacted by walking away “at a fast pace.” And although Bumpers’s reaction may not have been the type of headlong flight that occurred in Wardlow, case law is clear that “[ejvasive conduct, although stopping short of headlong flight,” is still an important factor for a court to consider when making a reasonable suspicion determination. United States v. Lender, 985 F.2d 151, 154 (4th Cir.1993); see also, e.g., Wardlow, 528 U.S. at 124, 120 S.Ct. 673; United States v. Sharpe, 470 U.S. 675, 682 n. 3, 105 S.Ct. 1568, 84 L.Ed.2d 605 (1985).
Bumpers’s attempt to dodge the police created suspicion in a way that was not present in United States v. Foster, 634 *176 F.3d 243, 247 (4th Cir.2011), and United States v. Massenburg, 654 F.3d 480, 493 (4th Cir.2011). In those cases, the defendants in no way sought to evade the police officers, but rather acknowledged and spoke with them, something that cannot be said of Bumpers. Moreover, Bumpers’s evasive conduct added to Officer Tinsley’s suspicion of criminal activity in another important respect beyond that which was present in Foster, Massenburg, and Ward-low. Here, Bumpers’s attempt to evade the police by leaving the premises at a “quick pace” amounted to the termination of the very crime of trespassing that the officer sought to investigate—a factor that was not present in the other cases. Officer Tinsley even testified that Bumpers’s reaction was consistent with a pattern of evasive activity that trespassers routinely engaged in at that exact location: “[Everybody does the same thing in this area ... they are back there on the—around that corner behind the dumpster [and] they immediately start to walk away” upon seeing the police.
In addition, Bumpers’s attempt to quickly vacate the premises and evade the police was suspicious in another regard: it was conduct more consistent with that of a trespasser than that of a lawful customer of the convenience store. The distinction is relevant because customers of the store are not trespassers, but rather invitees who have permission to be on the premises. See Va.Code Ann. § 18.2-119. Unlike a trespasser, most customers would have had little reason to do what Bumpers did: vacate the area “at a fast pace” immediately upon seeing the police.
Finally, Officer Tinsley testified that when Bumpers left the premises, he took a path that led him past the convenience store’s front door—and yet he made no effort to enter. This route did nothing to dispel the officer’s suspicion that Bumpers was neither a prior nor future lawful customer of the store. That is, the fact that Bumpers walked at a “quick pace” right by the entrance without entering suggested that he had not been standing by the dumpsters with some intention to shop at the store in the future. The route also made it unlikely that Bumpers had been a customer at the store immediately prior to seeing Officer Tinsley, because if that were so, it would have made little sense for him to exit the store heading in one direction (north, towards the side parking lot) only to then double back and retrace his steps in the opposite direction when it came time to leave. In other words, as the district court noted, Bumpers walked away from the spot where he was standing at a “quick pace,” in exactly the reverse direction that he would have taken had he actually earlier left the store as a legitimate customer.
In sum, the totality of these factors— each of which the trial judge considered carefully in his ruling—supports the district court’s conclusion that the officer had a reasonable suspicion that Bumpers was trespassing. To reverse the district court in light of these facts would impose a significant barrier to efforts to investigate trespassing violations in local shopping markets where security is critical. If the precise place had a less violent history, if the officer’s testimony had been less credible, if the evasive action had been less apparent, if the pattern of trespassing had been less consistent, a different result might obtain. As it is, a reversal of sound fact-finding risks signaling an unwarranted sanctuary for behavior to which the proprietors, employees, and patrons of neighborhood convenience stores should not be subject.
C.
Bumpers argues that reversing the district court in this case would not disable *177 police efforts to protect public safety because officers could instead initiate voluntary police-citizen encounters to determine whether a suspected trespasser had lawful business at a store. That suggestion overlooks reality. Consensual encounters may do little to prevent trespassers from leaving the premises upon noticing the police, only to return once the police have left.
Not to worry, Bumpers suggests, because the voluntary police encounter tactic can be supplemented by an approach in which reasonable suspicion of criminal activity may be found where store owners or customers place specific calls to the police indicating that a crime has occurred. But that too fails to recognize the reality of life in crime-ridden neighborhoods. To require a business owner or customer to personally investigate and then accuse every suspicious person who lurks outside a store would place the person doing the investigating and making the call at needless personal risk.
Bumpers’s argument also fails for the simple reason that it has been considered and rejected by the Supreme Court. His argument is at bottom that Officer Tins-ley’s decision to stop him for investigatory purposes was unreasonable because other less intrusive investigatory techniques could have been used instead. Yet in United States v. Sokolow, the Supreme Court explained that “[t]he reasonableness of the officer’s decision to stop a suspect does not turn on the availability of less intrusive investigatory techniques. Such a rule would unduly hamper the police’s ability to make swift, on-the-spot decisions ... and it would require courts to indulge in unrealistic second-guessing.” 490 U.S. 1, 11, 109 S.Ct. 1581, 104 L.Ed.2d 1 (1989) (internal quotation marks omitted). Officers must still, of course, be held accountable and required to explain to courts their actions, and the trial judge made sure that happened here.*
IV.
On the facts before us and for the reasons given, we affirm the judgment of the district court.

AFFIRMED

 The dissent worries that upholding the stop in this case might "encourage some officers to make race-based stops under the pretense of policing high-crime areas.” Post at 179-80. It is surely true that race-based stops occur and that they should be universally condemned. But race was not a factor in this case, and our friend in dissent appears to agree, post at 179-80 n.*. Thus, the district court analyzed the stop here by looking to objective factors such as Bumpers's location, his attempt to evade the police, the path he took in doing so, and the violent history of this specific site. Moreover, to view this matter through a racial lens would miss a large and important point. This case is about balancing the right of every individual in every neighborhood to avoid arbitrary police infringement on his liberty with the ability of law enforcement to ensure that every citizen of this country can exercise such basic liberties as visiting a local convenience store free from the threat of shooting and drug-related violence. Both of these are freedoms that *178 Americans of every race and every, background ought to be able to enjoy.