**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 13-4063**

UNITED STATES OF AMERICA,

                    Plaintiff – Appellee,

          v.

JOHN STACKS,

                    Defendant – Appellant.

Appeal from the United States District Court for the Western District of North Carolina, at Charlotte. Frank D. Whitney, Chief District Judge. (3:11-cr-00371-FDW-DCK-1)

Argued: January 30, 2014                     Decided: May 8, 2014

Before KING, WYNN, and FLOYD, Circuit Judges.

Affirmed by unpublished per curiam opinion.

**ARGUED**: Joshua B. Carpenter, FEDERAL DEFENDERS OF WESTERN NORTH CAROLINA, INC., Asheville, North Carolina, for Appellant. William Michael Miller, OFFICE OF THE UNITED STATES ATTORNEY, Charlotte, North Carolina, for Appellee. **ON BRIEF**: Henderson Hill, Executive Director, FEDERAL DEFENDERS OF WESTERN NORTH CAROLINA, INC., Charlotte, North Carolina, for Appellant. Anne M. Tompkins, United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Charlotte, North Carolina, for Appellee.

Unpublished opinions are not binding precedent in this circuit.

PER CURIAM:

John Stacks appeals his conviction for being a felon in possession of a firearm, in contravention of 18 U.S.C. § 922(g)(1). Stacks first challenges the district court's denial of his motion to suppress evidence obtained as a result of a traffic stop, maintaining that the officers lacked reasonable suspicion that he was engaged in criminal activity. Stacks also contends that his conviction should be vacated because the court improperly and prejudicially admitted lay opinion testimony of a police officer. As explained below, we reject the contention with respect to the suppression issue, discern no prejudicial error regarding the challenged testimony, and thus affirm Stacks's conviction.

I.

A.

Around four o'clock the morning of March 18, 2011, Officers Bryan Overman and Chandos Williams of the Charlotte-Mecklenburg Police Department were assigned to patrol the "Westpark Corridor," surrounding Westpark Drive, in Charlotte, North Carolina. The Westpark Corridor, a commercial area on the western side of Charlotte near Interstate 77, is home to several hotels, restaurants, and nightclubs. The area was known to the police, including Officers Overman and Williams, as a "hot spot

2

for breaking and entering motor vehicle cases," particularly during the early morning hours. See J.A. 31.[1] As such, the officers were dispatched to the Westpark Corridor the morning of March 18 to "do some surveillance on the hotels and along that corridor for the prevention of larceny from auto or vehicle break-ins." Id. At the time, Overman had been a police officer for more than seventeen years, nearly twelve of which were with the Charlotte-Mecklenburg Police Department, and nine of those in the Steele Creek Division, where the Westpark Corridor is located. Williams had been with the Charlotte-Mecklenburg Police Department for more than twenty years, and spent a majority of that time working in the Steele Creek Division.

After arriving at the Westpark Corridor and conducting an initial sweep of the area, the officers parked their unmarked patrol car in a business park. They turned off the headlights and the internal lights in the vehicle. From that vantage, the officers could observe the parking lots of several of the hotels on Westpark Drive. Despite the early morning hour, the parking lots and street were well-lit. The officers observed just "a handful" of people, mostly employees and deliverymen at the hotels. See J.A. 34.

---

[1] Citations herein to "J.A. ___" refer to the contents of the Joint Appendix filed by the parties in this appeal.

3

At approximately 4:30 a.m., the officers observed a brown two-door Cadillac drive past them on Westpark Drive. The Cadillac was driven by an African-American male later identified as Stacks, and there were no other passengers in the car. As the Cadillac passed the officers' parked unmarked vehicle, the officers observed the Cadillac's driver looking to his right, towards the hotels and parking lots. The officers did not see the driver look in their direction.

After passing the officers, the Cadillac turned into the parking lot of a Residence Inn and drove "up and down the rows of cars in the hotel parking lot." J.A. 37. The Cadillac then proceeded to the parking lot of the next hotel, again driving through the rows of parked cars without stopping or lingering. According to Officer Williams, it appeared the Cadillac's driver was either looking for a parking space or was lost. As the Cadillac exited the second parking lot and approached a third hotel (the last hotel on Westpark Drive before it dead-ended into a cul-de-sac), the officers decided to "stay with" the Cadillac and started driving towards the third hotel. Id. at 38. The officers left the headlights of their unmarked vehicle dark. After driving through the third hotel parking lot, the Cadillac pulled back onto Westpark Drive, driving north away from the hotels and the cul-de-sac. At that point, the officers were driving the opposite direction — towards the last hotel at

4

the end of the cul-de-sac. As the cars passed one another, Stacks saw the officers, turned around completely in his seat to look at them, and slowed the brown Cadillac down, "almost coming to a stop." Id. at 39.

Upon observing Stacks's reaction, the officers decided to initiate a traffic stop and activated the blue lights on their vehicle. Stacks pulled the Cadillac over, and Officer Overman approached the vehicle and requested Stacks's driver's license and registration. After Overman returned to the police vehicle to run Stacks's license and registration through the DMV database, Officer Williams approached the Cadillac and began to question Stacks. Williams asked Stacks why he was in the Westpark Corridor, and Stacks responded that he was dropping off his girlfriend, Kenia Boo; however, Stacks could not tell the officers where he had taken her.[2] While he was standing alongside the Cadillac questioning Stacks, Williams observed a "camouflage jacket that was in the back seat spread out almost like it was covering something." J.A. 74. Williams, cognizant that he was "out there looking for people that had been breaking

_____

[2] Stacks provided the officers with Ms. Boo's name and a telephone number, which the officers called later that morning. Boo spoke with Officer Williams, but failed to corroborate Stacks's claim that he had been dropping her off that morning. Stacks subsequently called the officers back from that same number and attempted to explain why he had fled from the traffic stop.

into cars," thought that the jacket could be concealing something because he had seen other defendants "hide stuff in the back seat, in the trunk, underneath the seats of the car, that kind of stuff." Id. at 75.

After learning that Stacks had previously been arrested several times for armed robbery, Officer Overman rejoined Officer Williams alongside the Cadillac. Overman recalled that Stacks looked "obviously nervous" in that he was talking fast and "fumbling around with his phone in his car." J.A. 43. The officers asked Stacks to step out of the car. In response, Stacks asked the officers if they had probable cause for their request. The officers explained that they did not need probable cause and again asked Stacks to exit the vehicle, whereupon Stacks pulled away from the curb and sped off. The officers returned to their vehicle and chased Stacks, but were not able to apprehend him. The officers thereafter obtained an arrest warrant for Stacks for resisting, delaying, and obstructing the officers, as well as for careless and reckless driving, all in violation of North Carolina law.

Several hours later, at approximately 8:00 a.m. on March 18, a guest at one of the hotels along Westpark Drive found a firearm underneath some bushes outside the Residence Inn and

gave it to a police officer he saw in the area.[3]  The firearm, which was later used as evidence in prosecuting Stacks, was a Cobra Enterprises Model CA-380 semiautomatic pistol.

Stacks turned himself in to the Charlotte-Mecklenburg Police later that morning.  While Stacks was in custody, Detective Jimmy Messer interviewed him and asked him about the pistol recovered from the bushes on Westpark Drive.  Stacks told Messer that he did not know anything about the firearm.  Later that day, while in jail on the obstruction and reckless driving charges, Stacks made five telephone calls to an unidentified female.  During those calls, which were recorded, Stacks made several incriminating statements about getting rid of a firearm, referring to the weapon as a "gun," a "burner," and an "iron." See J.A. 516, 525, 541-42, 556-59, 580.

B.

On November 15, 2011, a federal grand jury in the Western District of North Carolina returned an indictment charging Stacks under 18 U.S.C. § 922(g)(1) with being a felon in

---

[3] The Residence Inn's parking lot is the first of the three that the officers observed Stacks drive through on the morning of March 18, 2011.  The Residence Inn was therefore located within a few hundred yards of the spot on Westpark Drive where Stacks was stopped by Officers Williams and Overman.  The bushes where the pistol was found later that morning were on the left of the road, in the direction from which Stacks fled from the traffic stop.

possession of a firearm on March 18, 2011. On February 22, 2012, Stacks moved to suppress all of the evidence derived from the traffic stop — including his identity and his statements made during the stop and after his arrest, as well as the pistol recovered from the bushes on Westpark Drive — asserting that the stop violated his Fourth Amendment right to be free of unreasonable searches and seizures. At the conclusion of a February 27, 2012 suppression hearing, the district court took Stacks's motion under advisement and directed the parties to brief the following issue: Assuming, arguendo, that the stop was unconstitutional, "what is fruit of the poisonous tree and what is not, starting with the identity of the defendant himself." J.A. 129. After unsuccessfully urging the court to immediately decide the suppression motion solely on the basis of the constitutionality of the stop, the prosecution asserted that all of the evidence was admissible under either an inevitable discovery theory or the good faith exception to the exclusionary rule. Stacks challenged both contentions, maintaining that all of the government's evidence was tainted as fruit of the poisonous traffic stop.

On May 15, 2012, after conducting a supplemental hearing, the district court denied Stacks's suppression motion. See United States v. Stacks, No. 3:11-cr-00371 (W.D.N.C. May 15,

8

2012) (the "Order").[4]  In so doing, the court first ruled that the stop of Stacks's vehicle "was based on reasonable, articulable suspicion that criminal activity was afoot," and specified nearly a dozen factors in support of that conclusion. See Order 9.[5]  The court further determined that, even if it had

---

[4] The district court's unpublished Order is found at J.A. 258-71.

[5] The district court articulated that the following nine factors amounted to "reasonable articulable suspicion" that supported the stop of Stacks's Cadillac:

- "The area in which the officers were conducting surveillance, first saw Defendant, and conducted the traffic stop was an area well known to the officers specifically for automobile larceny and vehicle break-ins, which the Charlotte-Mecklenburg Police Department called a hot spot for breaking and entering motor vehicle cases";

- "The officers were conducting surveillance, and Defendant was present, during a time of night that is typical for automobile larcenies and vehicle break-ins to occur";

- "Defendant drove down Westpark Drive continually looking only in the direction of the hotel parking lots";

- "Defendant was alone in his vehicle at all relevant times";

- "Defendant drove up and down the rows of parked cars in three different hotel parking lots without parking, stopping, dropping off a passenger, or picking up a passenger";

- "While driving up and down the rows of parked cars, Defendant was continually looking in the direction of the parked cars";

(Continued)

deemed the stop unconstitutional, "much of the evidence in question would not be subject to exclusion." Id. at 13.[6]

Thereafter, prior to trial, the prosecution identified Detective James Helms of the Charlotte-Mecklenburg Police Department as an expert witness who would "provide expert testimony as to the general jargon and slang terminology used for firearms." J.A. 274. Stacks objected to the designation of Helms as an expert witness, contending that he lacked the requisite expertise to testify as an expert. Stacks further

---

- "Defendant exited each hotel parking lot and immediately entered another, exhibiting the same behavior in three (3) different hotel parking lots";

- "When Defendant saw the officers, who were in uniform, he slowed down"; and

- "When Defendant saw the officers, he turned around in his seat 180 degrees to look at the officers."

Suppression Order 9-10 (internal quotation marks omitted).

[6] The district court's alternative ruling was based on two theories. First, the court deemed the firearm abandoned property, meaning Stacks had no standing to challenge its seizure. Second, the court reasoned that when Stacks "fled the scene, he committed a new and distinct crime," and evidence "seized as a result of the new crime, such as the telephone calls from jail while under arrest for the new crimes would still be admissible." Id. Because we discern no error as to the court's reasonable suspicion determination, we need not reach its alternative ruling on the admissibility of the evidence against Stacks.

10

asserted that because the terms "burner" and "iron" are "commonly used in popular culture," expert testimony as to the meaning of those terms was not necessary or appropriate. Id. at 276-77. And, Stacks maintained that any probative value of Helms's expert testimony would be outweighed by prejudice to Stacks because Helms would also be testifying as a fact witness. During pretrial proceedings, the district court ruled that Helms would "not be qualified as an expert," but would be permitted to testify — "from his experience as a law enforcement officer" — about hearing "slang terms 'burn[er]' and 'iron' referring to firearms." Id. at 285.

At trial, the prosecution called nine witnesses, including Detective Helms, and introduced the recordings of the incriminating phone calls that Stacks made from jail on March 18, 2011. Helms testified that he recognized Stacks as the male voice on the recordings. Helms further testified as to his understanding of the recorded conversations, including that "burner" and "iron" are slang terms for a firearm. On June 5, 2012, the jury returned a verdict convicting Stacks of the charged 18 U.S.C. § 922(g)(1) offense. On January 15, 2013, the district court sentenced Stacks to 212 months in prison. Stacks timely noticed this appeal, and we possess jurisdiction pursuant to 28 U.S.C. § 1291.

11

II.

A.

We first address Stacks's challenge to the district court's ruling on his suppression motion — that is, his contention that the officers lacked reasonable suspicion to justify the March 18, 2011 traffic stop. In considering a district court's ruling on a motion to suppress, we review de novo the court's legal conclusions, while reviewing its underlying factual findings for clear error. See United States v. Foster, 634 F.3d 243, 246 (4th Cir. 2011). A court's determination that the facts of a citizen-police encounter give rise to reasonable suspicion is a legal one, which we review de novo. See United States v. Foreman, 369 F.3d 776, 782 (4th Cir. 2004). As the Supreme Court has instructed, in assessing determinations of reasonable suspicion, the courts of appeals are to "give due weight to inferences drawn from those facts by resident judges and local law enforcement officers." Ornelas v. United States, 517 U.S. 690, 699 (1996). Finally, where, as here, the government has prevailed in opposing a suppression motion, we review the evidence in the light most favorable to the government. See United States v. Davis, 690 F.3d 226, 233 (4th Cir. 2012).

1.

The Fourth Amendment "prohibits unreasonable searches and seizures by the Government, and its protections extend to brief

12

investigatory stops of persons or vehicles that fall short of traditional arrest." United States v. Arvizu, 534 U.S. 266, 273 (2002) (internal quotation marks omitted). In the nearly fifty years that have passed since issuing its seminal decision in Terry v. Ohio, 392 U.S. 1 (1968), the Supreme Court has frequently revisited the issue of reasonableness in the context of traffic stops and made clear that an investigatory stop "is permissible under the Fourth Amendment if supported by reasonable suspicion" that criminal activity may be afoot. Ornelas, 517 U.S. at 693.

Reasonable suspicion requires that an officer "be able to articulate something more than an inchoate and unparticularized suspicion or hunch" that criminal activity may be afoot. United States v. Sokolow, 490 U.S. 1, 7 (1989) (internal quotation marks omitted). In making reasonable-suspicion determinations, reviewing courts are to "look at the totality of the circumstances of each case to see whether the detaining officer ha[d] a particularized and objective basis for suspecting legal wrongdoing." Arvizu, 534 U.S. at 273 (internal quotation marks omitted). The Supreme Court has recognized that "the concept of reasonable suspicion is somewhat abstract," and reminded reviewing courts that officers are allowed "to draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them

13

that might well elude an untrained person." Id. (internal quotation marks omitted). Importantly, "the fact that the stop occurred in a high crime area [is] among the relevant contextual considerations" in this analysis; however, "[a]n individual's presence in an area of expected criminal activity, standing alone, is not enough to support a reasonable, particularized suspicion that the person is committing a crime." Illinois v. Wardlow, 528 U.S. 119, 124 (2000).

2.

Applying the foregoing standards, we conclude that Officers Williams and Overman had reasonable suspicion to stop Stacks's Cadillac in the predawn hours of March 18, 2011. We consider, as we must, the reasonableness of the officers' suspicions in light of the totality of the circumstances, and we address all of the supporting factors in turn.

We first consider the relevant — though not dispositive — fact that Stacks was in a high crime area when he was pulled over. Specifically, Stacks was driving in an area known as a hot spot for breaking and entering into automobiles — precisely the type of crime that the officers were assigned to prevent and in which they suspected Stacks might be engaged. Although this factor "carries no weight standing alone, an area's disposition toward criminal activity is an articulable fact, that may be considered along with more particularized factors to support a

14

reasonable suspicion." United States v. Sprinkle, 106 F.3d 613, 617 (4th Cir. 1997) (citations and internal quotation marks omitted).

In addition to being a high crime area, the Westpark Corridor is also an entirely commercial area consisting of a strip of hotels, restaurants, and nightclubs near a major interstate. As such, the area was extremely quiet in the early morning hours of March 18. Indeed, the officers observed "very, very little traffic" other than Stacks while they surveilled the area, namely "a handful" of workers and deliverymen going in and out of the hotels on the strip. J.A. 34. The suspiciousness of Stacks's conduct — driving slowly in and out of three hotel parking lots without making any stops — was compounded by the time of day. See United States v. Smith, 396 F.3d 579, 587 (4th Cir. 2005) (observing that lateness of the hour may raise level of suspicion); see also Wardlow, 528 U.S. at 129-30 (Stevens, J., concurring in part and dissenting in part) (observing that "[f]actors such as the time of day, the number of people in the area, [and] the character of the neighborhood" may be relevant in the reasonable suspicion analysis). Indeed, Stacks's conduct was more consistent with someone preparing to engage in criminal activity than with any of the legitimate activities occurring on Westpark Drive at that hour.

15

Stacks's reaction to the officers further supports the officers' reasonable suspicion. Having observed Stacks drive slowly through two parking lots without stopping, the officers drove toward Stacks, and the two vehicles passed as Stacks exited a third hotel parking lot. Upon seeing the officers, Stacks slowed his car substantially, coming almost to a complete stop, and craned himself around to look at the officers as they passed. Such a reaction, in Officer Overman's words, "sparked [the officers'] interest." J.A. 39. Coupled with the early hour, the commercial nature of the area, and the Cadillac's driving slowly through the parking lots, Stacks's reaction cemented the officers' reasonable suspicion that Stacks was engaged in, or about to engage in, criminal activity.

Stacks nevertheless contends that the officers lacked reasonable suspicion because the stop was based on nothing more than a vague hunch, thus falling far short of the reasonable suspicion required by the Fourth Amendment. We disagree. As this Court has previously explained, "factors that may be 'susceptible of innocent explanation' when taken in isolation can combine to 'form a particularized and objective basis' for a stop when considered together." United States v. Bumpers, 705 F.3d 168, 174-75 (4th Cir. 2013) (quoting Arvizu, 534 U.S. at 277-78). That is certainly the case here. Stacks could, perhaps, provide a reasonable and legal explanation for each of

16

the factors: the high crime area, the early morning hour, driving slowly without stopping, and the reaction to the police. Nevertheless, the whole of the circumstances facing the officers the morning of March 18 is greater than the sum of its parts. Considering, as we must, the totality of the circumstances, the officers possessed reasonable suspicion that Stacks may have been engaged in criminal activity.

B.

We next consider Stacks's contention that the trial court committed reversible error in allowing Detective Helms to testify as to his understanding of slang terminology for firearms. We review a district court's evidentiary rulings for abuse of discretion. See United States v. Johnson, 617 F.3d 286, 292 (4th Cir. 2010). Moreover, as we have explained, evidentiary rulings "are subject to harmless error review under Federal Rule of Criminal Procedure 52, such that in order to find a district court's error harmless, we need only be able to say with fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that the judgment was not substantially swayed by the error." Id. (internal quotation marks omitted).

Stacks maintains that because Detective Helms was not qualified as an expert, his opinion testimony should have been limited to his personal observations of the conversations at

17

issue. As there is no question that Helms did not personally observe his calls from jail, Stacks contends, Helms should not have been permitted to opine on the slang terms Stacks used in those calls. We agree.

Pursuant to Federal Rule of Evidence 701, lay opinion testimony — whether offered by a police officer or a civilian — must be based on the witness's personal knowledge. See United States v. Hassan, 742 F.3d 104, 135-36 (4th Cir. 2014). The situation here is similar to that presented in Johnson, where we determined that the district court abused its discretion in permitting lay opinion testimony of a DEA agent regarding his interpretation of the defendant's wiretapped phone calls. See 617 F.3d at 293. Because the agent's testimony was based on his "credentials and training, not his observations from the surveillance employed in [the] case," we concluded that "[h]is post-hoc assessments [could not] be credited as a substitute for the personal knowledge and perception required under Rule 701." Id. We underscored that, "to adequately build a foundation for lay testimony," the testimony must be "based on the perception of the witness." Id. at 292-93 (internal quotation marks omitted). Here, there similarly is no doubt that Detective Helms's testimony as to the slang terminology was not based on his observations from the recorded phone calls, but rather on

18

his general experience as a police officer. Accordingly, his testimony was not properly admitted under Rule 701.

Nevertheless, in light of the ample additional evidence linking Stacks to the firearm recovered from Westpark Drive, the district court's error was harmless. As we have explained, "when reviewing a nonconstitutional error under Rule 52(a), an appellate court must determine if the Government has proved 'with fair assurance . . . that the judgment was not substantially swayed by the error.'" United States v. Curbelo, 343 F.3d 273, 286 (4th Cir. 2003) (quoting Kotteakos v. United States, 328 U.S. 750, 765 (1946)).

In addition to the temporal and geographic proximity between the traffic stop and the discovery of the firearm, the jail calls included numerous references, both veiled and non, to Stacks possessing and disposing of a firearm after the March 18 traffic stop. No expert testimony was necessary to explain or interpret those calls; that Stacks was referring to a firearm would be obvious to any lay person who heard the recordings. Indeed, Stacks conceded as much when he argued before the district court that "words like 'burner' and 'iron' are commonly used in popular culture, and it would not assist the jury for a witness to opine on their meaning." J.A. 276. Given the common understanding of those terms, we are readily able to conclude —

19

with fair assurance — that the jury was not substantially swayed by the admission of Detective Helms's testimony.[7]

III.

Pursuant to the foregoing, we reject Stacks's contentions of error and affirm the judgment of conviction.

AFFIRMED

---

[7] Because there was substantial evidence in the record from which a juror could have found that Stacks was in possession of a firearm on March 18, 2011, we need not address the government's position that Detective Helms could have been qualified as an expert witness under Federal Rule of Evidence 702.  While Helms, as a veteran officer of thirteen years of experience, may well possess sufficient credentials to satisfy Rule 702, the district court explicitly declined to qualify him as an expert in this case.  That the court could have done so is of no matter in our harmlessness analysis.