**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

───────────

**No. 14-4733**

───────────

UNITED STATES OF AMERICA,

            Plaintiff - Appellee,

      v.

ANDRE   LAVAR   SLOCUMB,   a/k/a   Hakeem   Slocumb,   a/k/a
Hakeem Jones, a/k/a Anthony Francis,

            Defendant - Appellant.

───────────

Appeal from the United States District Court for the Western
District of Virginia, at Charlottesville.  Glen E. Conrad, Chief
District Judge.  (3:13-cr-00017-GEC-1)

───────────

Argued:  September 16, 2015            Decided:  October 22, 2015

───────────

Before GREGORY, AGEE, and DIAZ, Circuit Judges.

───────────

Reversed, vacated, and remanded for proceedings consistent with
this opinion by published opinion.  Judge Gregory wrote the
opinion, in which Judge Agee and Judge Diaz joined.

───────────

**ARGUED**: Andrea Lantz Harris, OFFICE OF THE FEDERAL PUBLIC
DEFENDER, Charlottesville, Virginia, for Appellant.   Jean
Barrett Hudson, OFFICE OF THE UNITED STATES ATTORNEY,
Charlottesville, Virginia, for Appellee.  **ON BRIEF**: Larry W.
Shelton, Federal Public Defender, Christine Madeleine Lee,
Research and Writing Attorney, OFFICE OF THE FEDERAL PUBLIC
DEFENDER, Roanoke, Virginia, for Appellant.  Timothy J. Heaphy,
United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY,
Roanoke, Virginia, for Appellee.

GREGORY, Circuit Judge:

Andre Slocumb appeals the district court's denial of his motion to suppress. Slocumb claims that the Culpeper, Virginia, Police Department obtained evidence and statements in violation of the Fourth Amendment by 1) detaining him without reasonable suspicion, 2) arresting him without probable cause, and 3) searching his car without valid consent. We conclude that the police lacked reasonable suspicion to detain Slocumb, and we therefore reverse the district court's denial of Slocumb's motion to suppress, vacate Slocumb's conviction and sentence, and remand for further proceedings.

I.

Around midnight on March 18, 2013, approximately ten armed officers with the Culpeper Police Department went to execute a search warrant on a house on Old Fredericksburg Road pursuant to a drug investigation. As a staging area, the officers used the parking lot of Culpeper Salvage, located across the street from the target house. The salvage business had closed earlier in the evening.

The officers knew the parking lot and the surrounding area as a place for drug activity. Lieutenant Timothy Chilton, who was present that night, had previously been in contact with the

2

owner of the salvage business about the parking lot being a place where drugs were bought and sold.

When the officers arrived, they encountered Slocumb, his girlfriend, Sierra Lewis, and an infant near two cars, a Cadillac and a Honda. The officers saw that Slocumb and Lewis were in the process of transferring a child car seat from the Cadillac to the Honda. As the other officers moved toward the target house, Chilton approached Slocumb and Lewis to inquire about their presence. Chilton noticed that Slocumb appeared to be hurrying Lewis. Slocumb told Chilton that Lewis's car had broken down and that he had come to pick her up. During their conversation, which lasted for less than a minute, Chilton believed Slocumb was acting evasively, as he did not make eye contact and gave mumbled responses to Chilton's questions.

In response to this information, Chilton called Officer Eric Grant for assistance. Within earshot of Slocumb, Chilton told Grant to stay with Slocumb and Lewis and that they were "not allowed to leave." Chilton then went to assist with the execution of the search warrant.

Slocumb told Grant his purpose for being there, consistent with what he had told Chilton, and that he had borrowed his landlord's car, the Honda, to pick Lewis up. Grant permitted Lewis to sit in the Honda with the infant but told Slocumb that he had to stay outside with him.

3

At some point, Grant asked Slocumb for identification. Slocumb said that he did not have any but that his name was "Anthony Francis," gave a birthdate, and said that he was from Georgia. Grant ran this information through dispatch, and it came back valid for someone with that name who matched Slocumb's physical appearance.

Grant asked Slocumb if he was carrying anything illegal; Slocumb said no. Slocumb also declined to give Grant consent to search him. When Grant explained what the other officers were doing and asked Slocumb about his knowledge of drugs at the target house, Grant observed Slocumb act increasingly nervous and not make eye contact.

Chilton sent Officer Ball to assist Grant before he himself returned to the parking lot about ten minutes later. When Chilton returned, Grant told him that Slocumb had given the name "Anthony Francis," which information had checked out. Chilton asked Slocumb a few additional questions, to which Slocumb provided what the officers believed to be inconsistent responses, including about any tattoos Slocumb had and any history of arrests.

Grant then asked Lewis for Slocumb's name. Lewis said that Slocumb's name was "Hakeem," which the officers recognized as someone who was under investigation for drug trafficking. Based on Lewis's response, Grant immediately placed Slocumb under

4

arrest for providing a false name. In a search incident to arrest, officers found close to $6,000 on his person.

In response to further questioning, Lewis told the officers that she had been dating Slocumb for a month and that she was pregnant with his child. She also said that she had never heard the name "Anthony Francis" and only knew him as "Hakeem Jones."

At that point, Officer Richard McKnight, who had also participated in the execution of the search warrant, joined Chilton and Grant in the parking lot. Chilton told McKnight that Slocumb had given a false name and that Lewis had identified him as "Hakeem Jones." McKnight asked Lewis if she knew whether Slocumb had ever been in the target house. Lewis said that she did not. McKnight also asked if there was anything illegal in the Cadillac or the Honda. Lewis told McKnight that there was nothing illegal in the Cadillac but that she wasn't sure about the Honda. McKnight then asked Lewis where Slocumb had been inside the Honda, and she responded that he was in the passenger seat. McKnight asked Lewis for consent to search the Honda, and she agreed.

McKnight found methamphetamine, cocaine powder, and cocaine base in a grocery bag under the passenger seat. He also found a purse in the trunk of the Honda that contained identification belonging to Linda Ross, Slocumb's landlord, and a small amount

5

of marijuana.  Slocumb claimed ownership of the drugs and said that Lewis did not have anything to do with them.

Officers took Slocumb to the magistrate's office, where he gave his real name, and made incriminating statements.  Chilton subsequently obtained a search warrant for Slocumb's residence and found marijuana smoking devices, a small amount of white powder, and other various items.

Following a federal grand jury's return of a three-count indictment against him, Slocumb filed a motion to suppress the physical evidence seized and statements made.  The district court denied Slocumb's motion in part, finding that his initial detention was supported by reasonable suspicion and finding that the officers had probable cause to arrest him.  The district court requested further argument regarding whether Lewis had authority to consent to the search of the Honda.

The district court held a supplemental hearing on the issue of consent.  Following the hearing, the court denied Slocumb's motion to suppress, finding that Lewis had apparent authority to consent.  Slocumb pleaded guilty pursuant to a plea agreement but retained the right to appeal the denial of his motion to suppress.  He was sentenced to ninety-four months on each count, to run concurrently.  Slocumb filed a timely notice of appeal.

## II.

In considering the appeal of a denial of a motion to suppress, we review the district court's legal conclusions de novo and its factual findings for clear error. United States v. Massenburg, 654 F.3d 480, 485 (4th Cir. 2011). We further construe the evidence in the light most favorable to the government—the prevailing party below. United States v. Foster, 634 F.3d 243, 246 (4th Cir. 2011).

## III.

Slocumb appeals the district court's denial of his motion to suppress, arguing first that Chilton did not have reasonable suspicion of criminal activity when he seized Slocumb.

The Fourth Amendment affords "[t]he right of the people to be secure in their persons, houses, papers, and effects against unreasonable searches and seizures." U.S. Const. amend. IV. A law enforcement officer is permitted to seize a person for a brief investigatory stop if he "observes unusual conduct which leads him reasonably to conclude in light of his experience that criminal activity may be afoot." Terry v. Ohio, 392 U.S. 1, 30 (1968); see also United States v. Black, 707 F.3d 531, 537 (4th Cir. 2013). A person is "seized" within the meaning of the Fourth Amendment if, "'in view of all the circumstances surrounding the incident, a reasonable person would have

7

believed that he was not free to leave.'" United States v. Gray, 883 F.2d 320, 322 (4th Cir. 1989) (quoting United States v. Mendenhall, 446 U.S. 544, 554 (1980) (plurality opinion)). Here, the parties do not dispute the district court's finding that Slocumb was seized by the time Grant arrived at the parking lot at Chilton's direction.

To justify a stop, the officer "must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." Terry, 392 U.S. at 21. The officer must have "reasonable and articulable suspicion that the person seized is engaged in criminal activity." Reid v. Georgia, 448 U.S. 438, 440 (1980). "The level of suspicion must be a 'particularized and objective basis for suspecting the particular person stopped of criminal activity.'" Black, 707 F.3d at 539 (quoting United States v. Griffin, 589 F.3d 148, 152 (4th Cir. 2009)); see also Massenburg, 654 F.3d at 486 ("We emphasize that the Constitution requires 'a *particularized* and objective basis for suspecting *the particular person stopped* of criminal activity.'" (quoting Griffin, 589 F.3d at 154)). That is, the officer must have more than an "inchoate and unparticularized suspicion or 'hunch.'" Terry, 392 U.S. at 27.

We look to the totality of the circumstances in determining whether the officer had reasonable suspicion of criminal

8

activity. United States v. Arvizu, 534 U.S. 266, 273 (2002). "[I]ndividual facts and observations cannot be evaluated in isolation from each other," United States v. Hernandez-Mendez, 626 F.3d 203, 208 (4th Cir. 2010); factors "susceptible to innocent explanation" individually may "suffice[] to form a particularized and objective basis" when taken together, Arvizu, 534 U.S. at 277.

Here, the factors considered by the district court—1) Chilton's awareness of the high-crime nature of the area; 2) the lateness of the hour; 3) Slocumb's presence in the parking lot of a commercial business that had been closed for several hours; 4) Slocumb's conduct, including appearing to hurry Lewis, giving low, mumbled responses to Chilton's questioning, and avoiding eye contact with Chilton; and 5) that Slocumb's conduct seemed "inconsistent" with his explanation for his presence—do not amount to reasonable suspicion under the totality of the circumstances in this case.

The objective factors mentioned by the district court—the high-crime area, the lateness of the hour, and the fact that the business had been closed for many hours—are permissible factors that can contribute to a finding of reasonable suspicion in the totality-of-the-circumstances analysis. E.g., United States v. Bumpers, 705 F.3d 168, 175 (4th Cir. 2013) (considering the high-crime area as a factor); United States v. Glover, 662 F.3d

9

694, 698 (4th Cir. 2011) (considering the high-crime area and the lateness of the hour as factors); United States v. Lender, 985 F.2d 151, 154 (4th Cir. 1993) (same); see also United States v. Hendricks, 319 F.3d 993, 1003 (7th Cir. 2003) (noting that the business establishment was closed); United States v. Briggman, 931 F.2d 705, 709 (11th Cir. 1991) (considering the fact that the "commercial establishments served by the lot were closed for the night" in its totality analysis). But these objective factors "do[] little to support the claimed particularized suspicion as to [Slocumb]." Massenburg, 654 F.3d at 488; see also Illinois v. Wardlow, 528 U.S. 119, 124 (2000) ("An individual's presence in an area of expected criminal activity, standing alone, is not enough to support a reasonable, particularized suspicion that the person is committing a crime.").

The district court also took into account Slocumb's individual behavior in finding reasonable suspicion, specifically the officers' account of Slocumb's evasive manner. Slocumb appeared to be hurrying Lewis, and he gave low, mumbled responses to Chilton's questions and failed to make eye contact with Chilton. The district court determined that this conduct was "seemingly inconsistent" with Slocumb's explanation for his presence in the parking lot—that is, that Lewis's car had broken down and he was picking her up. The court reasoned that "most

10

people with a disabled vehicle, particularly at such a late hour, would have little reason to avoid speaking to or making eye contact with a law enforcement officer who arrives on the scene, and, in all likelihood, would have welcomed the officer's arrival." J.A. 149. We disagree.

Slocumb's behavior—"the only substantial basis for *particularized* suspicion," Massenburg, 654 F.3d at 491—was insufficient to support reasonable suspicion. Slocumb did not, for example, walk away or attempt to leave, let alone take off in "[h]eadlong flight." Wardlow, 528 U.S. at 124. And Slocumb's other conduct, including Chilton's belief that Slocumb was hurrying Lewis, falls short of that which we have recognized in other cases as sufficient to support reasonable suspicion. In Bumpers, for example, we found that Bumpers "attempt[ed] to dodge the police" by "walking away 'at a fast pace'" when he and his companion noticed the patrol car. 705 F.3d at 175; see also id. at 175-76 (contrasting the facts in Bumpers with those in other cases where the defendants did not try to leave the premises but instead "acknowledged and spoke with them"); United States v. Humphries, 372 F.3d 653, 660 (4th Cir. 2004) (finding reasonable suspicion where, in conjunction with other factors, the defendant "walked away at a quick pace").

Where a defendant did not try to flee or leave the area, we have found reasonable suspicion on a showing of more "extreme"

11

or unusual nervousness or acts of evasion.  E.g., United States v. Foreman, 369 F.3d 776, 784 (4th Cir. 2004).  In Foreman, for example, we pointed to Foreman's "physical signs of extreme nervousness . . . (e.g., heavy breathing, heavy sweating, and pulsating of the carotid artery)."  Id. at 784; see also United States v. Branch, 537 F.3d 328, 338 (4th Cir. 2008) (finding that, in addition to several other factors, including failing to make eye contact, the defendant's hands were shaking); United States v. McFarley, 991 F.2d 1188, 1192 (4th Cir. 1993) (identifying the defendant's behavior as "unusually nervous" where his hands shook, he was breathing heavily, and he provided inconsistent answers).

Meanwhile, in United States v. Sprinkle, 106 F.3d 613 (4th Cir. 1997), we held that the officers did not have reasonable suspicion, even where one of the actors "raised his hand to the side of his face as if to conceal his identity" and subsequently drove away "in a normal, unhurried manner."  106 F.3d at 617–18. While "[h]iding one's face is an act that may be appraised with others in deciding whether suspicion reaches the threshold of reasonableness," we found that "without some stronger indication of criminal activity, this act cannot tip [a] case to reasonable suspicion."  Id. at 618.

We have cautioned that "it is important not to overplay a suspect's nervous behavior in situations where citizens would

12

normally be expected to be upset." Glover, 662 F.3d at 699 (citing Massenburg, 654 F.3d at 490). Here, Slocumb's actions—hurrying Lewis to finish the transfer of the car seat, keeping his head turned and avoiding eye contact, and giving low, mumbled responses—did not give rise to reasonable suspicion. There was no attempt to evade the officers, instead Slocumb "acknowledged [them], was not noticeably nervous, and did not hastily flee the area." Foster, 634 F.3d at 247. Any suspicion that Chilton might have had when he first approached Slocumb was dispelled when Slocumb gave answers consistent with his actions. At that point, there was no more reason to suspect that Slocumb was engaged in criminal activity than there was to believe his stated purpose and corresponding actions. Slocumb was simply "going about [his] business." Wardlow, 528 U.S. at 125.

As we have "warned against," Massenburg, 654 F.3d at 491, we will not "us[e] whatever facts are present, no matter how innocent, as indicia of suspicious activity," Foster, 634 F.3d at 248. The government "must do more than simply label a behavior as 'suspicious' to make it so"; rather, the government must be able to "articulate why a particular behavior is suspicious or logically demonstrate, given the surrounding circumstances, that the behavior is likely to be indicative of some more sinister activity than may appear at first glance." Massenburg, 654 F.3d at 491 (quoting Foster, 634 F.3d at 248).

13

Here, Chilton did not articulate why Slocumb's explanation for his presence in the parking lot and the activity accompanying it—both seemingly innocent acts—were "likely to be indicative of some more sinister activity." Id. Ultimately, this seizure had "no connection with the individual seized, the activity [he was] involved in, [his] mannerisms, or [his] suspiciousness; rather the seizure [was] a mere happenstance of geography." Black, 707 F.3d at 541.

IV.

Viewed in their totality, the factors cited by the district court do not amount to reasonable suspicion to justify Slocumb's seizure. The district court thus erred in denying Slocumb's motion to suppress. Therefore, we reverse the district court's ruling, vacate Slocumb's conviction and sentence, and remand for further proceedings consistent with this opinion.

REVERSED, VACATED, AND REMANDED
FOR PROCEEDINGS CONSISTENT WITH THIS OPINION