**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

No. 19-4904

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

v.

ANTHONY EUGENE PETERS,

Defendant - Appellant.

Appeal from the United States District Court for the Eastern District of Virginia, at Richmond. Henry E. Hudson, Senior District Judge. (3:19-cr-00082-HEH-1)

Argued: December 8, 2021                    Decided: February 24, 2023

Before GREGORY, Chief Judge, and TRAXLER and FLOYD, Senior Circuit Judges.

Reversed, vacated, and remanded by published opinion. Chief Judge Gregory wrote the opinion, in which Senior Judge Floyd joined. Senior Judge Traxler wrote a dissenting opinion.

**ARGUED:** Paul Geoffrey Gill, OFFICE OF THE FEDERAL PUBLIC DEFENDER, Richmond, Virginia, for Appellant. Stephen Eugene Anthony, OFFICE OF THE UNITED STATES ATTORNEY, Richmond, Virginia, for Appellee. **ON BRIEF:** Geremy C. Kamens, Federal Public Defender, OFFICE OF THE FEDERAL PUBLIC DEFENDER, Alexandria, Virginia, for Appellant. G. Zachary Terwilliger, United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Alexandria, Virginia, for Appellee.

GREGORY, Chief Judge:

Anthony Eugene Peters was indicted on one count of possession of a firearm by a person previously convicted of a felony, in violation of 18 U.S.C. § 922(g)(1). Peters and another individual, Gary Garrison, were walking down a sidewalk when the officers approached them, accused them of trespass, and requested that they lift their shirts to show they were unarmed. The Government argues that the officers suspected Peters of trespass for eight reasons—one of which includes Peters's association with Garrison, another suspected trespasser. Garrison, however, was permitted to walk away after lifting his shirt while Peters was seized until he did so. The officers found a firearm and ammunition on Peters's person pursuant to the seizure.

Peters filed a motion to suppress this evidence, arguing that the officers lacked reasonable suspicion when they seized him. Following an evidentiary hearing, during which the two officers testified, the district court found the stop was valid and denied the suppression motion. Peters then entered a conditional plea of guilty, preserving his right to appeal the denial of his motion.

On appeal, we find that the officers lacked reasonable and articulable suspicion to justify seizing Peters. Thus, we reverse the district court's order, vacate Peters's conviction, and remand for further proceedings consistent with this opinion.

I.

The Richmond Redevelopment and Housing Authority ("RRHA") owns numerous properties in Richmond, Virginia, including the Creighton Court apartment complex

2

("Creighton Court"). A Memorandum of Understanding ("MOU") between the RRHA and the Richmond Police Department ("RPD"), authorizes police officers to enforce state trespass laws on RRHA's properties and issue notice to any non-resident who is not: (1) a resident's guest; (2) a RRHA employee; or (3) on the property for "a legitimate business or social purpose." J.A. 247.

On February 3, 2019, at approximately 5:30 p.m., Officer Stephen Butler—an eight-year veteran of the RPD—was patrolling the area with Officer Mitchell Cooper, a trainee officer with a few days of experience (collectively "the officers"). The officers were uniformed, with their service weapons holstered, and in a patrol car. They saw Peters and a second individual, Garrison, walking along the sidewalk in the 2000 block of Creighton Road. Officer Butler recognized Garrison as an individual prohibited from being in Creighton Court.[1] Officer Butler also recognized Peters and knew that he had been arrested for trespassing in 2011. While Officer Butler later testified that he learned this trespass occurred in Creighton Court from the RPD Records Management System ("police records"),[2] a screenshot of the police records shows that the trespass location was not specified. J.A. 90, 248. The police records were also silent as to the arrest's final disposition.

---

[1] The RRHA apartment complexes have "No Trespassing" signs posted on the buildings. When asked by the district court however, Officer Butler testified that there were no signs along the walkways. J.A. 117.

[2] Officer Butler took screenshots of the information he viewed in the RPD Records Management System. These screenshots were admitted into evidence as Government's Exhibits 2–3.

One month prior, Officer Butler received an uncorroborated tip from a confidential informant that a male known as "Amp" sold crack cocaine at a specific address in Creighton Court. J.A. 92, 98. The informant described "Amp" as "a black male in his mid 20s . . . with a longer face" and "a slight goatee." J.A. 93. Upon seeing a photo, the informant identified Peters as "Amp," prompting Officer Butler to review Peters's record. The police records listed Peters's home residence as being on Mosby Street—outside Creighton Court—but made no reference as to when this information was collected or last updated. A section of the police records titled "Name Alerts" showed three separate alerts indicating Peters was believed to be: (1) a "gang member," as alerted in 2011; (2) a "narcotics seller/user," as alerted in 2009; and (3) "probably armed," as alerted in 2009. J.A. 249.

Having gathered this information, the officers activated their body cameras and exited the patrol car, walking toward Peters and Garrison. The district court admitted Officer Cooper's body camera footage into evidence, J.A. 250, and both of the officers testified that the video accurately depicts the encounter. J.A. 61–62, 104. The parties do not dispute the material facts, and this opinion describes the facts as reflected by the video. *See Scott v. Harris*, 550 U.S. 372, 381 (2007) (stating that the Court of Appeals "should have viewed the facts in the light depicted by the videotape"); *United States v. Kehoe*, 893 F.3d 232, 240 (4th Cir. 2018) ("[B]ody camera footage enables us to independently assess the facts in question and to affirm on the basis of our assessment, not that of the district court.").

Without directing them to stop, Officer Butler immediately stated that they were "not supposed to be out here." J.A. 64. The officers testified that they spoke in "stern"

4

and "authoritative" tones of voice.  J.A. 58, 69, 114–15.  Peters and Garrison continued walking when one of the officers asked if they "had any guns."  J.A. 114.  As they walked, they both answered no, and the officers requested that they lift their shirts.  In response, Garrison lifted his shirt and continued walking along the sidewalk.  Peters, on the other hand, who was dressed in formfitting "skinny jeans" and a hooded sweatshirt, only partially lifted his shirt and stopped walking when the officers repeated their request.  At this point, the officers were standing about three to five feet from Peters.  J.A. 193.  The video footage shows that the officers were positioned at a diagonal on both sides of Peters and an apartment building was behind him.  Officer Butler then alternated between asking Peters to lift his shirt and stating that he was barred from the area.  He addressed Peters as "Amp" and asked if he had an official form of identification.  Peters responded that he did not and asked that Officer Butler search his name in the police records to verify that he was not barred.  Peters also asked a bystander to call his mother.  Less than a minute after the encounter began, Officer Butler and Peters discussed what would happen next.

> Officer Butler:  So you don't mind if [Officer Cooper] pats you down?
>
> Peters:  I don't want him to pat me down.  Why he got to pat me down?
>
> Officer Butler:  So, you just want me to take you to jail then?
>
> Peters:  For what?
>
> Officer Butler:  For trespassing.

Video at 22:30:21–22:30:30.

Officer Butler then commented that Peters should consent to a "pat down," and the officers repeatedly asked Peters to lift his shirt while insisting that he was barred from the

5

property.  Video at 22:30:30–22:32:56.  Officer Butler also threatened to exercise his authority to take Peters to jail.  Video at 22:31:09–22:31:16 ("You're barred.  That's a class I misdemeanor in my presence.  You understand I can take you to jail for that, right?"); *see* Video at 22:30:26–22:30:28 ("So, you just want me to take you to jail then?").  In response, Peters repeatedly informed the officers that he was not barred from the property and asked that they verify their records.  He also stated that he was in Creighton Court visiting his family.  Video at 22:31:33.

About three minutes into the encounter, Officer Butler made a sudden forward motion—"like a buck," as he later described it—toward Peters, "[j]ust to see how he would respond."  J.A. 104 ("It was something that officers had told me like if you—you see how someone responds if you do that.  However, I see the immaturity in how I could cause an individual to either take flight or posture up, and so it's something that I've taken out of how I conduct my business on the street.").  Just under four minutes into the encounter, Peters lifted his shirt above his belt buckle.  At this moment, Officer Butler testified he "observed an object to the right side of [Peters's] fly" resembling "the muzzle of a pistol." J.A. 102; *see also* J.A. 137–38.  The officers both moved to secure Peters and ultimately recovered a firearm from his front waistband.  J.A. 60.

Peters was subsequently charged in a one-count indictment for possession of a firearm by a person previously convicted of a felony, in violation of 18 U.S.C. § 922(g). Peters filed a motion to suppress all evidence and statements made, arguing that they were the result of an unlawful seizure.  Officers Butler and Cooper testified at the suppression

6

hearing, and Peters's defense counsel cross-examined Officer Butler as to why he initiated

the encounter with Peters.

> Q:  And, Officer Butler, you agree that when you saw Mr. Peters, and [Garrison] walking down the street, that you stopped your vehicle so you [could] talk to them to investigate trespass, is that right?
>
> A:  Yes, ma'am.
>
> Q:  And your *only* basis for believing that Mr. Peters was trespassing, you've testified, was a 2011 arrest, correct?
>
> A:  That's correct.
>
> Q:  And you never checked, or you didn't prior to that February 3rd encounter, to see the disposition of that trespass, did you?
>
> A:  No, ma'am.
>
> Q:  Now, the government asked you, and you talked about, information that you had received from a confidential source about possible drug trafficking, is that right?
>
> A:  Yes, ma'am.
>
> Q:  But you were *not* investigating Mr. Peters on that day for possible drug trafficking, correct?
>
> A:  No, ma'am.
>
> Q:  And you *didn't have enough information* at that point to believe one way or the other that Mr. Peters was engaging in *any drug trafficking* activity in Creighton Court, correct?
>
> A:  On that day?
>
> Q:  Right.  On that day.
>
> A:  On that day *I got out of my vehicle to investigate trespassing*.

J.A. 117–20 (emphases added).

In addition to suspecting Peters of trespass, Officer Butler also suspected Peters was

armed.  This suspicion did not arise until after Officer Butler initiated the encounter.  J.A.

120. According to his testimony, the combination of Peters's skinny jeans and his refusal to fully lift his shirt led Officer Butler to believe Peters was armed. When asked if this was his "sole basis" for suspecting that Peters was armed, the Government objected, arguing that this misconstrued Officer Butler's testimony. J.A. 123. Overruling the objection, the district court stated that Officer Butler could correct any mischaracterization. Officer Butler did not make a correction and, instead, confirmed that he suspected Peters was armed because of his skinny jeans and refusal to fully lift his shirt.

> Q: [S]o was it the skinny jeans in conjunction with him doing a slight lift . . . ?
>
> A: Yes.
>
> Q: And that's the *sole basis*?
>
> A: That's correct.

J.A. 124 (emphasis added).

The district court denied Peters's suppression motion, concluding that Officer Butler had "articulable suspicion" upon encountering Peters because of the information included in the police records, Peters's refusal to raise his shirt and prove he was unarmed, and Officer Butler's observation of the outline of a firearm on Peters's person. J.A. 196.

Peters then entered a conditional plea of guilty and preserved his right to appeal the denial of his motion to suppress. The district court sentenced Peters to 120 months of imprisonment and three years of supervised release. This timely appeal followed.

II.

"Where, as here, the Government prevailed on the motion in the district court, we construe the evidence in the light most favorable to the Government." *United States v. Mitchell*, 963 F.3d 385, 390 (4th Cir. 2020) (citation omitted). This court reviews the district court's legal conclusions de novo and its factual findings for clear error. *United States v. Cloud*, 994 F.3d 233, 241 (4th Cir. 2021).

III.

The Fourth Amendment safeguards "[t]he right of the people to be secure in their persons, houses, papers, and effects against unreasonable searches and seizures." U.S. Const. amend. IV. Consensual encounters between a police officer and an individual require no objective justification. *Florida v. Bostick*, 501 U.S. 429, 434 (1991). Investigatory stops, however, must be supported by reasonable, articulable suspicion that the individual is engaged in criminal activity. *Terry v. Ohio*, 392 U.S. 1, 21 (1968); *see also United States v. Slocumb*, 804 F.3d 677, 681 (4th Cir. 2015).

In reviewing whether the district court erred by denying Peters's motion to suppress, we must first establish when he was seized, and then determine if reasonable suspicion justified the seizure.

A.

A seizure, as understood under the Fourth Amendment, occurs "[o]nly when the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen." *Terry*, 392 U.S. at 19 n.16. This is measured by whether, "in view of

9

all the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." *United States v. Mendenhall*, 446 U.S. 544, 554 (1980) (plurality opinion). When establishing whether a reasonable person would feel free to leave, we consider several factors, including:

> (i) the number of police officers present; (ii) whether the police officers were in uniform; (iii) whether the police officers displayed their weapons; (iv) whether they touched the defendant or made any attempt to physically block his departure or restrain his movement; (v) the use of language or tone of voice indicating that compliance with the officer's request might be compelled; (vi) whether the officers informed the defendant that they suspected him of illegal activity rather than treating the encounter as routine in nature; and (vii) whether, if the officer requested from the defendant . . . some form of official identification, the officer promptly returned it.

*United States v. Black*, 707 F.3d 531, 537–38 (4th Cir. 2013) (citation and internal quotation marks omitted); *see also, e.g.*, *Wingate v. Fulford*, 987 F.3d 299, 305 (4th Cir. 2021) (holding that the officer elevated a voluntary encounter to an investigatory stop upon telling the defendant that he could not leave until he identified himself); *United States v. Bowman*, 884 F.3d 200, 212–13 (4th Cir. 2018) (determining that the defendant was seized when he began exiting a patrol car and the police officer stated, "just hang tight right there, ok?"); *United States v. Jones*, 678 F.3d 293, 303–04 (4th Cir. 2012) (finding that the defendant was seized when uniformed officers followed him from public to private property, blocked his car, and immediately asked that he lift his shirt and consent to a pat down search—noting that "[a]ny one of these facts on its own might very well be sufficient to transform a consensual encounter into a detention").

Looking to the totality of the circumstances, we find that Peters was seized approximately one minute into the encounter when Officer Butler threatened to exercise

his authority to take Peters to jail for trespass and suggested that Peters should consent to a pat down.[3] Both the officers were in uniform, with their service weapons holstered, and exited their patrol car upon seeing Peters and Garrison. They spoke in "stern" and "authoritative" tones of voice while asking Peters and Garrison if they were armed and to lift their shirts. Garrison complied by lifting his shirt, and the officers allowed him to walk away. Peters, however, did not comply—only partially lifting his shirt—which led the officers to repeat their request, and Peters stopped and turned around. Although the Government maintains that the officers' interaction with Peters constituted a consensual encounter, we find otherwise. "[W]hen an officer, without reasonable suspicion or probable cause, approaches an individual, the individual has a right to ignore the police and go about his business." *Illinois v. Wardlow*, 528 U.S. 119, 125 (2000) (citing *Florida v. Royer*, 460 U.S. 491, 498 (1983)). Mere "refusal to cooperate, without more, does not furnish the minimal level of objective justification needed for a detention or seizure." *Bostick*, 501 U.S. at 437.

After insisting that Peters lift his shirt, Officer Butler made a clear show of authority when he proposed taking Peters to jail for trespass. Once Peters responded by claiming that he had done nothing wrong, Officer Butler countered that he should, therefore, not "mind" if Officer Cooper patted him down. A reasonable person would not feel free to leave if an officer says he can take the person to jail for a specific crime, or threatens that he will do so. This is especially true after being accused of the specific crime several times. A reasonable

---

[3] We need not consider whether Peters was seized at any point prior to this moment because, even if so, the result of our analysis would remain the same.

11

person in Peters's circumstance would at least feel obligated to lift his shirt in order to leave. In fact, while the officers began by accusing both Peters and Garrison of trespass, they permitted Garrison to walk away after he complied and continued asking Peters to lift his shirt when he did not. *See Jones*, 678 F.3d at 303 ("A request certainly is not an order, but a request—two back-to-back requests in this case—that conveys the requisite show of authority 'may be enough to make a reasonable person feel that he would not be free to leave.'" (quoting *United States v. Richardson*, 385 F.3d 625, 629 (6th Cir. 2004))).

## B.

We next determine whether Peters's seizure was justified by reasonable suspicion. Reviewing courts measure reasonable suspicion "by the totality of the circumstances." *United States v. Powell*, 666 F.3d 180, 186 (4th Cir. 2011) (citing *United States v. Arvizu*, 534 U.S. 266, 273 (2002)). "Reasonable suspicion to initiate a brief investigative traffic stop requires a particularized and objective basis for suspecting the particular person stopped of criminal activity." *United States v. Feliciana*, 974 F.3d 519, 523 (4th Cir. 2020) (citations and internal quotation marks omitted). It is well settled that "the police officer must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." *Terry*, 392 U.S. at 21. Thus, the reasonable suspicion analysis is of an "*officer-centered* nature." *United States v. Perkins*, 363 F.3d 317, 323 (4th Cir. 2004) (emphasis added). While "[s]eemingly innocent factors" may demonstrate reasonable suspicion when viewed together, "the Government cannot rely upon post hoc rationalizations to validate those seizures that happen to turn up

12

contraband." *United States v. Foster*, 824 F.3d 84, 89 (4th Cir. 2016) (citation and internal quotation marks omitted).

The Government argues in its brief that the following eight factors created reasonable suspicion that Peters was engaged in trespass and was armed: (1) a confidential informant identified Peters as a person who sold crack cocaine from a specific address in Creighton Court; (2) the confidential informant was previously reliable; (3) Peters's "last known address" was not in Creighton Court; (4) Peters "was present with Garrison," an individual the officers stated was barred from Creighton Court; (5) Peters was "nearly in front of" the building where the informant said Peters sold drugs; (6) Peters had a 2011 arrest for trespass; (7) three police alerts marked Peters as a gang member in 2011, a buyer or seller of narcotics in 2009, and "probably armed" in 2009; and (8) Officer Butler observed drug-trafficking in Creighton Court where he found "drug-dealing and armed violence was one [of] the residents' chief complaints to [the] police"—none of such observations involved Peters. Appellee's Br. 11–12, 19.

We consider these eight factors, not in isolation, but within the wider context of the complete record. In doing so, we note that a full review of this record suggests that the Government's eight factors reimagine the basis upon which Officer Butler suspected that Peters was engaged in criminal activity. It is "the *police officer*" who "must be able to point to specific and articulable facts"—not a party's brief. *Terry*, 392 U.S. at 21 (emphasis added). During cross-examination, Officer Butler confirmed that he stopped Peters to investigate trespass and that his suspicion of trespass was based solely upon Peters's 2011 arrest for trespass. J.A. 118–19. Neither inconsistent, nor irreconcilable, Officer Butler's

13

testimony should be read together as it also informs our review of the facts in their totality. Nevertheless, we address the factors raised by the Government to explain why they, when viewed in their totality, still fall short of the reasonable suspicion standard necessary to seize Peters.

First, Peters's criminal history as outlined in the police records does not justify Officer Butler's suspicion that he was trespassing in Creighton Court. *See United States v. Foster*, 634 F.3d 243, 247 (4th Cir. 2011) (finding that, like past arrests and convictions, "knowledge that a suspect is merely under investigation" does not demonstrate reasonable suspicion without additional facts).  As we have clarified in the past, holding otherwise would allow "any person with any sort of criminal record—or even worse, a person with arrests but no convictions—[to] be subjected to an investigative stop . . . at any time without the need for any other justification at all."  *Powell*, 666 F.3d at 188 (citation omitted).  The police alerts—marking Peters as a "gang member" in 2011, a buyer or seller of narcotics in 2009, and "probably armed" in 2009—preceded the encounter by at least eight years.[4]

---

[4] The Government's reliance on the 2011 "gang alert" also raises issues surrounding the general reliability of gang alerts and databases.  At least one gang task force in Virginia has stopped using its gang database after noting its "declining utility."  Justin Jouvenal, *Virginia police task force drops use of controversial gang database*, Wash. Post (Jan. 28, 2021), https://www.washingtonpost.com/local/public-safety/gangnet-database-controversy/2021/01/27/0decb3d4-5bfd-11eb-b8bd-ee36b1cd18bf_story.html. (last visited Feb 23, 2022) (saved as ECF opinion attachment).  At least two of our sister circuits have discussed these issues.  *See Diaz Ortiz v. Garland*, 23 F.4th 1, 19 (1st Cir. 2022) (en banc) (reversing the Board of Immigration Appeals' denial of the defendant's petition because the gang database—which the agency relied upon to find the defendant was a gang member and therefore not credible—gave the court "no reason to believe the (Continued)

In *Powell*, we evaluated the usefulness of similar police database information, labeled "caution data," and ultimately found that it could not provide the police officer with grounds for reasonable suspicion without additional facts. 666 F.3d at 184, 188 (noting that "caution data"—information indicating the defendant had "priors" and a suspended license—lacked specificity, because there was no information as to when the data was collected or if it resulted in a conviction). Likewise, the record here is silent as to what led the officers to create the alerts, whether doing so led to further action, and whether the information had been updated since collected. Therefore, without more specific facts, these alerts do not heighten any suspicion that Peters was engaged in crime. *See United States v. Sprinkle*, 106 F. 613, 617 (4th Cir. 1997) (finding that an individual "recently finish[ing] a sentence" and having a criminal record alone cannot show reasonable suspicion).

Police records also indicated that Peters was arrested for trespass in 2011 but did not include the location of the trespass or final disposition of the arrest. J.A. 248. Officer Butler also confirmed that he did not know whether the arrest resulted in a conviction. During the encounter, Peters asked Officer Butler to "run his name" to prove that he was not barred from the property. J.A. 121. Officer Butler testified that he did not do so because he did

---

[database] labeled these individuals as gang members on any basis other than an application of the [detailed point system used to identify individuals]" and identifying an individual based on this "system alone, without additional information to bolster the credibility of its conclusion, is not reliable."); *see also Vasquez v. Rackauckas*, 734 F.3d 1025, 1046 (9th Cir. 2013) ("Determining whether an individual is an active gang member presents a considerable risk of error. The informal structure of gangs, the often-fleeting nature of gang membership, and the lack of objective criteria in making the assessment all heighten the need for careful factfinding.").

not feel comfortable diverting his attention or leaving Officer Cooper, his trainee, alone with someone he suspected was armed. J.A. 106–07, 121–22.

Instead, Officer Butler chose to continue the interaction with Peters in the same manner and make a sudden movement, or "buck," toward him "[j]ust to see how [Peters] would respond." J.A. 104. Officer Butler also testified that he did not ask Officer Cooper to verify whether Peters was barred because he was unsure "how familiar [Officer Cooper] was with the operating system of our record management." J.A. 124. While this may explain why Officer Butler did not take additional steps to investigate, it does not change the fact that his suspicion of trespass was based on an arrest—not a conviction—that was eight years old. Although Officer Butler was not obligated to grant Peters's request and verify whether he was barred, his decision not to do so factors into the circumstances. And had Officer Butler done so, he would have learned that Peters's 2011 arrest did not result in a conviction and that his name did not appear on the list of individuals barred from Creighton Court. J.A. 14 n.1, 194.

Second, while Officer Butler testified that he received a confidential informant's tip alleging that Peters sold crack cocaine in front of a certain address in Creighton Court, he also testified that the reason he seized Peters was the suspected trespass. It is worth noting that when asked if he had "enough information" to believe Peters was trafficking drugs in Creighton Court, Officer Butler responded that he did not, and he stopped Peters to investigate trespass. J.A. 118. At oral argument, however, the Government linked the two together by contending that Officer Butler's trespass suspicion was predicated on his drug trafficking suspicion when considered within the context of Creighton Court's MOU. Oral

16

Argument at 2:25:29, *United States v. Peters* (4th Cir. Dec. 8, 2021) (No. 19-4904), https://www.ca4.uscourts.gov/OAarchive/mp3/19-4904-20211208.mp3. Under the MOU, an individual in Creighton Court is a trespasser unless found to be: (1) a resident; (2) a RRHA employee; or (3) there for "a legitimate business or social purpose." J.A. 247. According to the Government, Officer Butler reasonably suspected Peters of trespass because he: (1) did not live in Creighton Court according to police records; (2) was not a RRHA employee, although the Government did not explain its basis for assuming this conclusion; and (3) was walking near the apartment building where an informant stated Peters sold drugs—rather than engaging in "a legitimate business or social purpose."

The confidential informant's tip could not have significantly elevated the police officers' suspicion. Because tips vary in reliability, we have found it necessary to "take into account all the facts surrounding a tip in assessing the totality of the circumstances supporting a stop." *United States v. Drakeford*, 992 F.3d 255, 264 (4th Cir. 2021) (citation omitted). It is thus of crucial importance that Officer Butler had not taken any notable steps to corroborate the confidential informant's statement. While the confidential informant had successfully collaborated with the RPD in the past, Officer Butler testified that he did not corroborate this tip beyond referencing the police records.[5] Neither did the officers describe witnessing any furtive gestures indicative of drug-related activity before Peters's

---

[5] Although the confidential informant had provided information leading to arrests and convictions, Officer Butler conceded that the informant had several prior felony convictions, a pending felony drug charge, and was "inactive with the [RPD]" at the time of the hearing. J.A. 151.

17

seizure. And despite his six and a half years patrolling the Creighton Court area, Officer Butler did not mention ever having seen Peters selling drugs.

Instead, the Government points to the fact that Peters was "nearly in front of" the building where the confidential informant claimed that he sold drugs. Appellee's Br. 11. But this observation is not as persuasive as the Government purports it to be. Peters was not attempting to enter, leave, or even linger near the building. Indeed, the body camera depicts Peters and Garrison continuing to walk down the sidewalk—a pedestrian travel lane often stretching past buildings—when the officers began the interaction. And neither does Officer Butler's general observation that "drug-dealing and armed violence" are "chief complaints to police" strongly support a particularized finding of reasonable suspicion in this case. Appellee's Br. at 19; *see Wardlow*, 528 U.S. at 124 ("An individual's presence in an area of expected criminal activity, standing alone, is not enough to support a reasonable, particularized suspicion that the person is committing a crime.").

Third, the fact that Peters was seen walking with Garrison—who the officers stated was barred—is not particular to Peters. *See Black*, 707 F.3d at 540 (finding that another individual's arrest cannot be the basis of reasonable suspicion concerning the defendant). This factor is especially unpersuasive because the officers allowed Garrison to walk away. If Officer Butler believed Peters was trespassing because of his association with Garrison, it does not follow that the officers would only stop Peters and permit Garrison to leave. Also, unlike the officer in *Terry*, who observed the defendants' movements for at least ten minutes before "becom[ing] thoroughly suspicious," Officers Butler and Cooper spent no time investigating Peters or Garrison before approaching them. 392 U.S. at 6. Instead, the

18

officers stopped their patrol car upon seeing Peters and Garrison, and immediately accused them of trespass before asking that they lift their shirts. This action is more indicative of a generalized sweep for guns rather than a particularized suspicion of criminal activity.

Peters's reaction to the officers' questions is also distinguishable from that of the defendant in *Bumpers*, as relied on by the Government, where we found that the officers had reasonable suspicion to believe the defendant was trespassing on a convenience store's parking lot. *United States v. Bumpers*, 705 F.3d 168, 175–76 (4th Cir. 2013). There, the defendant—standing next to garbage dumpsters without any bags or items suggesting he was a patron—left "almost immediately" and walked "at a fast pace" away from the store upon seeing the police officer. *Id.* at 170. Instead of attempting to walk away from the officers here, Peters stopped and insisted he was not trespassing. *Cf. id.* at 176 ("Bumpers's attempt to dodge the police created suspicion in a way that was not present in [previous cases]."); *Wardlow*, 528 U.S. at 124 (finding that "headlong flight" is evasive behavior which may indicate wrongdoing). Even if Officer Butler knew that Peters's 2011 arrest for trespass occurred in Creighton Court, an arrest alone does not support reasonable suspicion. Furthermore, because non-residents are not necessarily trespassers under the MOU, the police records listing Peters's residence as outside Creighton Court does not add much weight to Officer Butler's suspicion.

Although the preceding discussion addresses why the Government's factors fail to give rise to reasonable suspicion, we find it necessary to also explain why the police officers' suspicion that Peters was armed further fails to legitimize their actions. Our good colleague in dissent takes issue with this and, at the same time, laments our supposed lack

19

of review of the district court's findings. *See* Dissenting Op. at 38–43. One need only look to the district court's findings, however, to understand why such an explanation is necessary. Indeed, the district court found "Officer Butler clearly had articulable suspicion that [Peters] may be engaged in criminal activity when he encountered him," and that "[t]his suspicion escalated as [the officers] approached the men." J.A. 196. It then noted Peters's 2011 trespass arrest, as well as the outdated police records indicating Peters was "probably armed" and "had also been previously implicated in selling narcotics." *Id.* Finding a "well-founded probability that [Peters] was most likely a trespasser," the district court determined that "Officer Butler was justified in requesting that [Peters] raise his shirt to show that he was not armed." *Id.* It also found that Peters's "partial compliance" effectively "elevated" Officer Butler's suspicion. *Id.* Because we disagree with the district court's analysis of this "escalated" and "elevated" suspicion, we press on to explain why.

To start, the Government relies on Peters's repeated refusal to fully lift his shirt when arguing that the officers' actions were supported by reasonable suspicion. Officer Butler articulated this same reasoning at the suppression hearing. Based on his years of experience working as a police officer in "not only Creighton [Court], but Whitcomb, Mosby, Fairfield, so other housing communities in that area," Officer Butler testified, that "the typical response of somebody who is not armed" is to "lift up their shirt well above their waistline to prove that they don't have a weapon on them." J.A. 122. He also testified that confidential sources informed him "men specifically were wearing skinny jeans drawn tightly with a belt and would wedge a firearm in their waistband[.]" J.A.122–23.

20

In other words, before seeing the outline of a firearm, Officer Butler based his suspicion that Peters was armed on two factors:  (1) Peters's skinny jeans; and (2) Peters's refusal to fully lift his shirt.  *See* Appellee's Br. at 6–7.  A general tip "that men specifically were wearing skinny jeans" to "wedge a firearm in their waistband" does not justify the seizure here, because it is not at all particular to Peters.  J.A. 122–23.  The argument that this rises to the level of reasonable suspicion is premised, at least in part, on the belief that individuals like Peters—present in public housing communities like Creighton Court—must lift their shirts upon request to prove they are unarmed.  Such a belief cannot provide reasonable suspicion because "a refusal to cooperate" alone does not justify a seizure. *United States v. Massenburg*, 654 F.3d 480, 490–91 (4th Cir. 2011) (quoting *Bostick*, 501 U.S. at 437); *see also Royer*, 460 U.S. at 498 (noting that refusal to listen or answer questions does not demonstrate an objective basis supporting detention). To hold otherwise would seemingly give way to the sort of general searches that we, as an en banc court, have found to violate the Fourth Amendment.  *See United States v. Curry*, 965 F.3d 313, 326 (4th Cir. 2020) (en banc) ("Allowing officers to bypass the individualized suspicion requirement based on the information they had here—the sound of gunfire and the general location where it may have originated—would completely cripple a fundamental Fourth Amendment protection and create a dangerous precedent.").

In *Curry*, we found that gunfire in a general location—following six shootings and two homicides that occurred in the area in the preceding three months—failed to create exigent circumstances allowing officers to search the defendant after he declined to fully lift his shirt and give an officer "a full view of [the defendant's] waistband."  *Id.* at 317

21

(referencing the officer's testimony that he asked the defendant "to lift his shirt again" because the defendant "nonchalantly pick[ed up] the left side of his shirt where [the officer] could not get a full view of his waistband"). By doing so, we refused to accord special weight to the Government's argument that recent shootings in Creighton Court justified a suspicionless seizure. *Id.* at 331. To be sure, this case is distinguishable from *Curry* because while there were no emergency conditions present here, the police officers had identified Peters prior to seizing him and believed that he was trespassing.

In attempting to justify Officer Butler's suspicion that Peters was armed, however, the Government advances the same underlying argument that failed in *Curry*, that is, that a general factor may be used to legitimize the assumption that individuals present in public housing communities should lift their shirts upon request. The product of this reasoning can be seen here. Despite suspecting both individuals of trespass, Garrison's surrender of his right not to lift his shirt freed him while Peters's assertion of his right not to lift his shirt was used to justify his seizure.

The record is clear that Peters was seized and his compliance with the officers repeated request to lift his shirt was the only way he could avoid further detention or formal arrest. When asked why he suspected Peters of having a weapon, Officer Butler's response was unequivocal. He stated,

> Okay. So when I initially got out of the vehicle—so the individual with him, Gary Garrison, that's like a very typical way if you ask someone, hey, do you have a weapon on you, they will show freely—like they'll lift up their shirt well above their waistline to *prove* that they don't have a weapon on them. And so from my six and a half years of experience of working not only Creighton [Court], but Whitcomb, Mosby, Fairfield, so other housing communities in that area, that has been the *typical response of somebody who*

22

> *is not armed* to feel like "nope." Like I won't say no problem, but they will lift up and show more than what's even requested.

J.A. 122 (emphases added).[6] Officer Butler thus perceived Peters's failure to respond as a "typical" unarmed person, and Peters's skinny jeans, to indicate that he was armed. J.A. 123. But as we have already made clear, we renounce arguments that "risk[] treating members of our communities as second-class citizens." *Curry*, 965 F.3d at 331 (quoting *Utah v. Strieff*, 579 U.S. 232, 252 (2016) (Sotomayor, J., dissenting)). We therefore reject any argument that would "deem residents of Creighton Court—or any other high-crime area—less worthy of Fourth Amendment protection by making them more susceptible to search and seizure by virtue of where they live." *Id.* at 331.[7]

Although the officers did not physically restrain Peters until he lifted his shirt high enough for Officer Butler to see the outline of a firearm, the officers *did* continue to seize Peters without reasonable suspicion. In *Baker*, we found the officer acted with reasonable suspicion that the defendant was armed when he first, "observed a triangular-shaped bulge underneath the front of [the defendant's] shirt, near the waistband of his pants," and then "ordered [the defendant] to lift his shirt above the bulge." *United States v. Baker*, 78 F.3d 135, 136 (4th Cir. 1996) (reversing the district court's order and denying the defendant's motion to suppress the firearm).

---

[6] We note that these "other housing communities" named by Officer Butler are all *public* housing communities. *See* J.A. 247.

[7] Thus, without more indication that Peters was armed, Officer Butler's testimony concerning "the typical response of somebody who is not armed" cannot recast Peters's exercise of his right not to lift his shirt into a suspicious act. J.A. 122. *See Black*, 707 F.3d at 540 ("Being a felon in possession of a firearm is not the default status.").

23

We see this reasoning reversed here because the officers began by approaching Peters, accusing him of trespass, and requesting that he lift his shirt. Once Peters chose not to comply with the officers' request by only partially lifting his shirt, the officers repeated the same request, stating that Peters should "just do it" because if Peters was unarmed then "it shouldn't be a problem"—"it's that simple." Video at 22:31:07–22:32:00. When Peters protested that he had shown the officers the contents of his pockets, Officer Butler responded, "that's not what I asked" and continued the seizure until Peters *did* do what the officers asked—fully lift his shirt. Video at 22:31:03. It was only after "requesting" that Peters lift his shirt at least *fifteen* times, inferring that Peters should submit to a pat down two times, and mentioning that Peters could be taken to jail for trespass two times that Officer Butler observed "what appeared to be like the bulge or the outline of a muzzle of a pistol" below Peters's belt buckle. J.A. 135; *see also Minnesota v. Dickerson*, 508 U.S. 366, 379 (1993) (noting that a search was unjustified when "the incriminating character of [an item] was not immediately apparent" but discovered "only as a result of a further search"). To rely upon Officer Butler's observation of the outline of the firearm as giving rise to reasonable suspicion, without considering the coercive effect of the preceding events, would adopt too shallow a view of the depth of the protections guaranteed to *all* citizens under the Fourth Amendment.

With little analysis and almost no factual comparison to other Fourth Amendment case law, it is difficult to understand why the dissent finds the surrounding circumstances objectively sufficient to justify Peters's seizure—other than because the district court concluded as much. But for the reasons discussed, we find that case law indicates

24

otherwise and thus conclude that the Government's factors—when weighed and assessed in the totality of the circumstances—do not constitute reasonable suspicion to justify the seizure. Officer Butler's knowledge of Peters's home address—as reflected and undated in the police records—and an eight-year-old arrest for trespass fail to constitute reasonable suspicion that Peters was trespassing as a non-resident who was not a resident's guest, a RRHA employee, or pursuing a legitimate business or social purpose. Efforts to then cobble together the various outdated or unparticularized factors identified to bolster the informant's tip—without further investigation or any first-hand observations to corroborate the allegation—add little to support a particularized suspicion. This is especially true given the circumstances of the seizure by which Garrison, who was also suspected of trespass, was free to walk away after lifting his shirt. It is for these reasons that Peters's seizure was unreasonable.

## IV.

We find that the officers did not act with reasonable suspicion when they seized Peters and the district court erred in denying the motion to suppress. Thus, we reverse the district court's ruling, vacate Peters's conviction, and remand the case for further proceedings consistent with this opinion.

*REVERSED, VACATED, AND REMANDED*

25

TRAXLER, Senior Circuit Judge, dissenting:

The majority concludes that this case involves a Fourth Amendment seizure rather than a consensual encounter and that Officers Butler and Cooper lacked reasonable suspicion to stop Peters when they saw him on the street. I agree that this case involves a seizure, but I do not agree that the reasonable suspicion was lacking. To reach its decision, the majority ignores the district court's findings of fact and the standard of review, makes its own factual findings, and then declares those facts insufficient to create reasonable suspicion. And along the way, the majority improperly converts the reasonable-suspicion inquiry into a subjective rather than objective inquiry. In my view, our standard of review compels us to accept the district court's factual findings, and those facts are sufficient to establish reasonable suspicion for the stop and subsequent search of Peters' person, as required by *Terry v. Ohio*, 392 U.S. 1 (1968). Accordingly, I respectfully dissent.

I.

"Under *Terry*, an officer may conduct a brief investigatory stop based on reasonable, articulable suspicion of criminal activity. If the person is validly stopped, then the officer may conduct a protective frisk, . . . so long as the officer reasonably believes that the person is armed and dangerous." *United States v. Curry*, 965 F.3d 313, 320 (4th Cir. 2020) (en banc) (cleaned up). "Facts innocent in themselves may together amount to reasonable suspicion . . . . And because reasonable suspicion is a less demanding standard, it can arise from information that is less reliable than that required to show probable cause." *United States v. Mitchell*, 963 F.3d 385, 390 (4th Cir. 2020) (cleaned up); *see Kansas v. Glover*,

26

140 S. Ct. 1183, 1188 (2020) ("The reasonable suspicion inquiry falls considerably short of 51% accuracy.") (cleaned up).

Viewed in the light most favorable to the government, *see United States v. Cloud*, 994 F.3d 233, 241 (4th Cir. 2021), the evidence shows the following facts. Through a Memorandum of Understanding (MOU) with the Richmond Redevelopment Housing Authority, the Richmond Police Department is authorized to enforce trespassing laws on Housing Authority property. Access to Housing Authority properties is limited to residents and their guests, Housing Authority employees, and those with a "legitimate business or social purpose." J.A. 247. A person has no legitimate business or social purpose if, *inter alia*, the person "reasonably appears" to be engaged in conduct that violates state or federal law. J.A. 247. Officer Butler, who patrolled the area encompassing Creighton Court for more than six years, testified that complaints about gun violence and drug dealing were among the most common complaints he received from Creighton Court residents.

Officer Butler testified that he opened an investigative file on Peters in January 2019 after receiving information from a confidential informant (CI) that Peters was selling drugs out of a specific address in Creighton Court. Butler had worked with the CI previously and found him to be trustworthy, as his previous information had led to multiple arrests and convictions. In the course of his preliminary investigation, Butler reviewed various police databases and learned that Peters' most recent address was not within Creighton Court and that he had been arrested for trespassing at Creighton Court in 2011.

A few weeks after opening the investigative file, Butler while on patrol in his car saw Peters walking in Creighton Court. Peters was accompanied by another person

27

(Garrison) who Butler knew and believed was barred from the property. Peters was very close to and headed in the direction of the specific address identified by the CI as Peters' base of drug operations. Peters was wearing skinny jeans, which Butler had learned were being favored by some drug dealers because the jeans fit tightly and could hold a hidden gun securely at the waist.

Officers Butler and Cooper got out of the car and immediately began challenging Peters and Garrison, telling them they were not allowed to be on the property and asking them to raise their shirts to show they had no weapons. Garrison raised his shirt and continued walking away; the officers made no attempt to stop him. Peters, however, stopped walking, turned around, and began engaging with the officers. Peters repeatedly told the officers that he was not barred from the property and said he did not want to be searched. Several minutes into the encounter, Peters raised the bottom of his shirt very carefully so as to expose his belt buckle only. Butler testified that as Peters lifted his shirt, he saw to the right of Peters' fly the outline of what looked like the barrel of a pistol. Butler placed his palm on Peters' waistband and felt what he believed was the grip of a pistol. Butler and Cooper then handcuffed Peters and removed the gun tucked into the waist of his jeans.

Over the course of his direct and redirect testimony, Officer Butler articulated all the facts and factors discussed above. On cross-examination, however, Butler agreed with questions from counsel for Peters that narrowed the bases for Butler's actions. Butler responded "[t]hat's correct" when counsel asked, "your only basis for believing that Mr. Peters was trespassing, you've testified, was a 2011 arrest, correct?" J.A. 118. As to why

28

Butler believed Peters was armed, counsel posited that the "sole basis" was that Peters was wearing skinny jeans and only partially lifted his shirt, and Butler again agreed. J.A. 124. When denying the suppression motion, the district court relied on the various factors testified to by Butler on direct and re-direct examination. The court concluded that reasonable suspicion for the stop existed because Butler believed that Peters was barred from Creighton Court and had information that he was selling drugs out of Creighton Court, which suggested that Peters was trespassing. The court found that Butler "credibly testified" that he saw the outline of a gun when Peters partially lifted the bottom of his shirt, which provided reasonable suspicion for the search. J.A. 196.

## II.

Whether reasonable suspicion exists is an objective inquiry that focuses on the totality of the circumstances. "We assess the totality of the circumstances to determine if an objectively reasonable police officer would have had reasonable articulable suspicion that [the defendant] was committing a crime at the time the officers seized him." *United States v. Kehoe*, 893 F.3d 232, 238 (4th Cir. 2018).

"The principal components of a determination of reasonable suspicion . . . will be the events which occurred leading up to the stop or search, and then the decision whether these historical facts, viewed from the standpoint of an objectively reasonable police officer, amount to reasonable suspicion or to probable cause." *Ornelas v. United States*, 517 U.S. 690, 696 (1996). The ultimate issue of the existence *vel non* of reasonable suspicion is a mixed question of law and fact reviewed de novo, *see id*. at 699, but the district court's findings of historical fact must be accepted unless they are "against the *clear*

29

*weight* of the evidence considered as a whole." *United States v. Ferebee*, 957 F.3d 406, 417 (4th Cir. 2020) (cleaned up); *see Ornelas*, 517 U.S. at 699 (explaining that appellate courts must "review findings of historical fact only for clear error and . . . give due weight to inferences drawn from those facts by resident judges and local law enforcement officers"). When these standards are properly applied, I believe they compel us to affirm the judgment of the district court.

Although there were some inconsistencies between Officer Butler's testimony on direct- and cross-examination, the district court's distillation and understanding of Butler's testimony was reasonable, and we are obliged to accept it. *See United States v. Manbeck*, 744 F.2d 360, 392 (4th Cir. 1984) ("It is axiomatic that it is the role of the factfinder, not the appellate court, to resolve conflicts in testimony, weigh the evidence, and judge the credibility of witnesses."). The question, then, is whether the historical facts as found by the district court establish reasonable suspicion. I believe they do.

According to the information reviewed by Butler, Peters did not currently live in Creighton Court and had previously been arrested for trespassing there, and his companion had also been barred from Creighton Court. While those pieces of information did not foreclose the possibility that Peters was a guest or had some other legitimate purpose, Officer Butler also had very recent information--from a source Butler believed to be reliable--that Peters was dealing drugs out of the Creighton Court unit he was walking towards. Although Butler testified that he was investigating Peters that day for trespassing only, not drug dealing, that does not mean the CI's information about Peters selling drugs in Creighton Court was irrelevant. As explained above, the agreement between the Housing

Authority and the Police Department provides that a person dealing drugs on the property has no legitimate purpose for being on the property and is therefore a trespasser. Accordingly, even if Butler's knowledge of Peters' prior trespassing arrest and his knowledge that Peters did not live in Creighton Court were not enough on their own to create reasonable suspicion, the CI's tip about Peters' drug activities provided further reason for Officer Butler to suspect that Peters was trespassing. I believe these facts, when considered together, were sufficient to establish reasonable suspicion.

Although the initial seizure was justified, the subsequent pat-down was proper only if the "officer reasonably believes that the person is armed and dangerous." *Curry*, 965 F.3d at 320 (cleaned up). Butler's observation during the stop of what appeared to be the outline of a gun was, in and of itself, sufficient to provide a reasonable belief that Peters was armed and dangerous. *See Pennsylvania v. Mimms*, 434 U.S. 106, 112 (1977) ("The bulge in the jacket permitted the officer to conclude that Mimms was armed and thus posed a serious and present danger to the safety of the officer. In these circumstances, any man of reasonable caution would likely have conducted the pat down.") (cleaned up).[1] It may well be that Peters' skinny jeans caused Butler from the very first moment to suspect that Peters was armed, as the majority contends. Butler, however, *did not act* on that personal suspicion. Instead, he searched Peters only *after* he saw the outline of the gun barrel. Thus, while I agree with the majority that skinny jeans do not automatically create reasonable

---

[1] Because the search was justified by Butler's observation of the outline of the gun, there is no need to consider whether Peters' evasive actions when asked to lift his shirt would have been enough, on their own, to provide reasonable suspicion that Peters was armed.

31

suspicion that the skinny-jeans-wearer is armed, that point is irrelevant. The question is whether reasonable suspicion existed at the time of the search, and Butler's observation of the outline of the gun barrel was sufficient on its own to support the search.

I recognize, of course, that the information the officers had about Peters was neither perfect nor complete. Butler had done nothing to corroborate the CI's tip that Peters was selling drugs out of a Creighton Court unit. And while the CI had given credible information in the past that led to arrests and convictions, the CI had gotten into legal trouble by the time of trial and was no longer being used as an informant by the Richmond Police Department. Moreover, Peters' trespassing arrest was not a recent one, and he was never convicted of that offense. Peters repeatedly told the officers that he was not barred, and Butler could have gotten more current information about Peters' status from police dispatch during the stop. None of these points, however, makes it improper for the officers to have relied on the information they had at the time of the stop.

Reasonable suspicion is a "commonsense, nontechnical" standard. *Ornelas v. United States*, 517 U.S. 690, 695 (1996). "The reasonable suspicion inquiry falls considerably short of 51% accuracy, for, as we have explained, to be reasonable is not to be perfect." *Glover*, 140 S. Ct. at 1188 (cleaned up). Police are not required to exclude all possible innocent explanations for the conduct before initiating a stop, nor are they required to accept or investigate a suspect's claim of no wrongdoing before acting. It would be impractical and inconsistent with the public-interest and safety concerns animating the *Terry* doctrine for courts to require law enforcement to pause and update all of their information before investigating possible criminal activity unfolding before them. *See*

32

*Terry*, 392 U.S. at 22 (explaining that the government's interest in "effective crime prevention and detection . . . underlies the recognition that a police officer may in appropriate circumstances and in an appropriate manner approach a person for purposes of investigating possibly criminal behavior even though there is no probable cause to make an arrest"); *id.* at 24 ("[W]e cannot blind ourselves to the need for law enforcement officers to protect themselves and other prospective victims of violence in situations where they may lack probable cause for an arrest.").

Because the initial stop was supported by reasonable suspicion that Peters was trespassing and the subsequent search was supported by reasonable suspicion that he was armed, the officers' conduct was consistent with the Fourth Amendment. The district court properly therefore denied Peters' motion to suppress.

## III.

The majority reaches the opposite conclusion and holds that the district court erred by denying the suppression motion. In my view, the majority reaches this result by overstepping its authority as a reviewing court and substituting its own view of the facts for those found by the district court.

As demonstrated above, resolution of this appeal requires us to determine whether the historical facts found by the district court are clearly erroneous and, if not, "whether the[] historical facts, viewed from the standpoint of an objectively reasonable police officer, amount to reasonable suspicion." *Ornelas*, 517 U.S. at 696. The majority falters at both steps.

33

A.

The first step of the inquiry is to review the district court's factual findings. Rather than review the findings, however, the majority ignores them and then selectively picks through the testimony to create its own set of facts. The district court determined that Butler stopped Peters for trespassing because of Butler's knowledge of Peters' then-current address and the information from the CI; the majority says that Butler stopped Peters solely because of Peters' 2011 trespassing arrest. The district court held that the search was justified given Butler's testimony that he saw the outline of a gun, but the majority says that the search was based on Peters' skinny jeans and failure to lift his shirt. The majority does not acknowledge the specific findings made by the district court, much less attempt to explain why those findings are clearly erroneous.

The majority's view of the facts is based solely on the testimony Butler provided on cross-examination. Although the majority claims it is considering the entirety of his testimony, *see* Majority Op. at 13, the majority in reality considers only the answers given by Butler on cross-examination. *See id.* ("During cross-examination, Officer Butler confirmed both that he stopped Peters to investigate trespass and that his suspicion of trespass was based solely upon Peters' 2011 arrest for trespass."); *id.* at 22-23 (referring only to Butler's cross-examination when discussing Butler's suspicion that Peters was armed).

While Butler's answers on cross-examination were not entirely consistent with the rest of his testimony, that inconsistency does not permit the *reviewing court* to decide which portion of his testimony to accept. As already discussed, it is the job of the *district*

34

*court* to resolve any conflicts in Butler's testimony, and it is our job to accept the district court's answer. *See Manbeck*, 744 F.2d at 392 ("It is axiomatic that it is the role of the factfinder, not the appellate court, to resolve conflicts in testimony, weigh the evidence, and judge the credibility of witnesses."); *see also United States v. Boone*, 279 F.3d 163, 189 (3d Cir. 2002) ("[The factfinder] is free to believe part of a witness' testimony and disbelieve another part of it. Thus, a witness' testimony is not insufficient to establish a point simply because he or she later contradicts or alters it.") (cleaned up). The district court heard all of Butler's testimony and reconciled any inconsistencies through its findings of fact. Yet the majority ignores those factual findings, just as it ignores the constraints of clear-error review.

The majority suggests its constricted view of Butler's testimony is simply a function of the "'*officer-centered* nature'" of the reasonable-suspicion analysis. Majority Op. at 12 (quoting *United States v. Perkins*, 363 F.3d 317, 323 (4th Cir. 2004)). The majority relies on this point to accuse the government (which in its brief points to multiple facts as supporting the existence of reasonable suspicion) of "reimagin[ing] the basis upon which Officer Butler suspected that Peters was engaged in criminal activity." Maj. Op at 13. The majority's push-back against the government might be understandable if, for example, the government were relying on information about which Butler was unaware when trying to show the existence of reasonable suspicion. *See United States v. Massenburg*, 654 F.3d 480, 495 (4th Cir. 2011) (explaining that information unknown to the officer performing a search "cannot enter into the [reasonable-suspicion] calculus"). In this case, however, *all of the factors* identified by the government in its appellate brief were known to Officer

35

Butler at the time of the stop and were testified to by Butler at the hearing. Under these circumstances, there simply is nothing improper about the government pointing to all of those facts as a basis for affirming the district court's judgment.

Our case law has never insisted on any magic words or particular phrasing from the police officer when testifying about the reasons underlying a *Terry* stop. Instead, as is always the case when facts are in dispute, it is up to the factfinder to consider the witness's testimony in its entirety in order to determine the relevant historical facts. In this case, the district court as factfinder considered the whole of Officer Butler's testimony and understood that testimony to include Butler's knowledge of Peters' address and the information from the CI as part of the reasonable-suspicion calculus. Those are the facts that we must consider in this appeal, not the facts as recast by the majority.

Moreover, the majority's narrow focus on Butler's cross-examination testimony distorts the objective nature of the reasonable-suspicion inquiry. The majority excludes the CI's information from its reasonable-suspicion analysis because Butler did not articulate the CIs information as a basis for the stop and testified that he stopped Peters for trespassing, not drug-dealing. The task of a court considering the propriety of a *Terry* stop, however, is to determine "whether the[] historical facts, *viewed from the standpoint of an objectively reasonable police officer*, amount to reasonable suspicion." *Ornelas*, 517 U.S. at 696 (emphasis added). Thus, the question before us is whether the facts known to Butler would cause a reasonable officer to believe that criminal activity was afoot; Butler's subjective view of the evidence is irrelevant. *See United States v. Foreman*, 369 F.3d 776, 781 (4th Cir. 2004) ("Because reasonable suspicion is an objective test, we examine the

36

facts within the knowledge of [the officer] to determine the presence or nonexistence of reasonable suspicion; we do not examine the [officer's] subjective beliefs to determine whether he thought that the facts constituted reasonable suspicion.").

## B.

In addition to ignoring the standard of review and the factual findings made by the district court, the majority also improperly applies the totality-of-the-circumstances standard.

The totality-of-the-circumstances standard requires the court to consider the *cumulative weight* of all of the information known to the officer. That is, each piece of information is put on the scale to see if it is enough to tip the pointer over to "reasonable suspicion." If the first bit of information isn't enough, it stays on the scale while the other pieces of information are added. *See, e.g., United States v. McBride*, 676 F.3d 385, 392 (4th Cir. 2012) (explaining that the totality-of-the-circumstances inquiry "requires [the reviewing court] to evaluate the *cumulative information available to the detaining officer*, rather than engaging in piecemeal refutation of the individual facts upon which the officer relied during the *Terry* stop") (emphasis added). While the majority claims to consider the totality of the information available to Officer Butler, *see* Majority Op. at 14, one searches that opinion in vain for any actual consideration of the cumulative weight of the information. Instead, the majority engages in the piecemeal refutation our cases have expressly prohibited—the majority examines each piece of information individually, finds it inadequate, and then tosses it off the scale before weighing the next piece.

As I have explained, I believe reasonable suspicion that Peters was trespassing can be established through just a few facts: Butler knew Peters had previously been arrested for trespassing at Creighton Court; Butler knew that Peters' then-current address was not in Creighton Court; and Butler had fresh information from a previously reliable CI that Peters was selling drugs in Creighton Court. Even if none of these individual facts, standing alone, would be enough to show reasonable suspicion, that does not mean that the individual pieces of information have no value or relevance to the inquiry. *See United States v. Arvizu*, 534 U.S. 266, 274 (2002) ("The court's evaluation and rejection of seven of the listed factors in isolation from each other does not take into account the totality of the circumstances. . . . The court appeared to believe that each observation by [the officer] that was by itself readily susceptible to an innocent explanation was entitled to no weight. *Terry,* however, precludes this sort of divide-and-conquer analysis.") (cleaned up). When the individual pieces of information known to Butler are all on the scale together, I believe their cumulative weight is enough to tip the scale and establish reasonable suspicion.

C.

Once the majority concluded that the facts that it decided to consider were insufficient to establish reasonable suspicion, that should have been the end of its analysis and its opinion. The majority, however, spends the last five pages of its opinion discussing the evidence tending to show that Peters was armed. According to the majority, this discussion is necessary to "explain why the police officers' suspicion that Peters was armed further fails to legitimize their actions at the time of Peters' seizure." Majority Op. at 19;

38

*see id.* at 23 (noting that while "the officers did not physically restrain Peters until he lifted his shirt high enough for Officer Butler to see the outline of a firearm, the officers *did* continue to seize Peters without reasonable suspicion").

I find this argument baffling. No one—not the government, and certainly not me—is suggesting that an observation made by the police *after a suspect has been stopped* can be used to somehow retroactively validate the initial stop. *See Curry*, 965 F.3d at 320 ("If the initial stop was [unauthorized], then [the defendant's] subsequent actions cannot make the stop legal."); *United States v. Black*, 707 F.3d 531, 539 n.5 (4th Cir. 2013) (rejecting as "irrelevant" to the reasonable-suspicion inquiry facts that occurred after the initial seizure of the defendant); *United States v. Simmons*, 560 F.3d 98, 107 (2d Cir. 2009) ("The grounds for a stop must exist at the time of the [stop]. . . . The events that occurred after [the defendant was stopped], therefore, do not factor into the analysis of reasonable suspicion for the initial stop."). Instead, Butler's observation of the outline of a gun goes to the propriety of the officers' *physical search* of Peters, which occurred *after* the initial stop. As discussed, a *Terry* stop is authorized if there is reasonable suspicion a crime is afoot; a pat-down after the stop is authorized only if there is also reason to believe the suspect is armed and dangerous. *See Curry*, 965 F.3d at 320 ("Under *Terry*, an officer may conduct a brief investigatory stop based on reasonable, articulable suspicion of criminal activity. If the person is validly stopped, then the officer may conduct a protective frisk, a pat-down of the person's outer clothing for weapons, *so long as the officer reasonably believes that the person is armed and dangerous*.") (cleaned up; emphasis added).

39

Because there is no jurisprudential reason for the majority to continue on even after determining that the officers lacked reasonable suspicion, it seems to me that the real point of the majority's disquisition is to further express its displeasure with Officer Butler's practice of asking Creighton Court residents to lift their shirts to show that they are not armed.[2] For what it's worth, I share some of the majority's concern about the practice of routinely and without individualized suspicion asking people in Creighton Court and other public housing communities to lift their shirts to show they are not armed. As police are unlikely to make the same routine, suspicionless demands of people present in higher-income neighborhoods, reasonable questions can be raised about the wisdom and propriety of the approach taken by the Richmond police. The question in this case, however, is not whether it is wise as a matter of policy to routinely ask public housing residents to lift their shirts to prove they are not armed, but whether the officers' requests *to Peters in this case* violated any constitutional standards.

As I have explained, Butler had reasonable suspicion to stop Peters as soon as he saw him, without regard to the lift-your-shirt directives or Peters' response to them. And once the stop became custodial, Butler asking Peters to lift his shirt was no different from

---

[2] As part of its criticism of Butler's practice of asking public housing residents to lift their shirts, the majority also complains about the disparate treatment of Garrison, Peters' companion who continued walking away and was not stopped by the police. The officers' inaction towards Garrison simply has no relevance to this case. The question on appeal is whether there was reasonable suspicion to stop Peters, not whether there would have been reasonable suspicion to support a hypothetical stop of Garrison. In any event, it seems apparent why the officers focused on Peters rather than Garrison. The CI's information about drug dealing involved Peters, not Garrison. And while Garrison kept walking, Peters stopped and turned around to engage with the officers.

asking Peters to empty his pockets. Police routinely asks such questions during custodial encounters as a means of ensuring their own safety. A suspect's refusal to comply cannot establish reasonable suspicion that he is armed, but the police are still free to ask the question. *See Illinois v. Wardlow*, 528 U.S. 119, 125 (2000) (explaining that a "refusal to cooperate, without more, does not furnish the minimal level of objective justification needed for a detention or seizure") (cleaned up).

In the majority's view, however, these safety-based questions made during a custodial stop were not routine, but instead were somehow improper and coercive. And because it believes the directives were coercive, the majority takes an extraordinary step— it declines to consider the evidence that Officer Butler saw the outline of a gun after Peters slightly lifted his shirt. Even under the majority's misguided view of the law, where conduct occurring after a stop can affect the legality of the initial stop, the majority's approach makes no sense.

In the context of police interrogations, coercion involves things like threats, violence, promises of reward, and undue influence. *See, e.g., United States v. Braxton*, 112 F.3d 777, 780 (4th Cir. 1997). Officer Butler's request for Peters to lift his shirt was not coercive no matter how many times the request was repeated. The requests were attempts to ensure the safety of the officers during a close-range custodial stop, and they were not improper. *See Terry*, 392 U.S. at 24 ("[W]e cannot blind ourselves to the need for law enforcement officers to protect themselves and other prospective victims of violence in situations where they may lack probable cause for an arrest. When an officer is justified in believing that *the individual whose suspicious behavior he is investigating at close range*

41

is armed and presently dangerous to the officer or to others, it would appear to be clearly unreasonable to deny the officer the power to take necessary measures to determine whether the person is in fact carrying a weapon and to neutralize the threat of physical harm.") (emphasis added). While there may be good reason to question the wisdom of Officer Butler's lift-your-shirt approach to community policing, the directives issued to Peters in this case have no bearing on the reasonable-suspicion inquiry and provide no basis for the majority to disregard evidence found credible by the district court.

IV.

As explained above, binding precedent requires us to defer to the district court's findings of historical fact unless clearly erroneous. Because the district court's findings in this case are based on the testimony of Officer Butler and the district court's resolution of apparent inconsistencies created by Butler's answers on cross-examination, there is no legitimate basis for this court to reject the district court's findings. The majority apparently recognizes this point, given its failure to acknowledge the district court's specific factual findings and the absence of any effort to explain why the district court's findings are not entitled to deference or otherwise reconcile its approach with binding precedent.

Unable to reach its desired result by properly applying the governing cases, the majority has charted a new path. Ignoring the factual findings of the district court and freeing itself from the strictures of deferential appellate review, the majority makes its own findings of fact and declares those facts insufficient to establish reasonable suspicion. I decline to join the majority's off-road adventure. Our standard of review compels us to

42

43

accept the district court's findings of fact, and I believe those facts are sufficient to establish

reasonable suspicion for the stop and search. Accordingly, I dissent.